Hector Gutierrez
**RODRIGUEZ, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 04–89–00114–CR.**

Court of Appeals of Texas,
San Antonio.

July 11, 1990.

Richard Langlois, San Antonio, for appellant.

Fred G. Rodriguez, J. Anne Kelley, Mike Gebhart, Edward F. Shaughnessy, III, Crim. Dist. Attys., San Antonio, for appellee.

Before BUTTS, CHAPA and ONION (Assigned),[1] JJ.

OPINION

ONION, Justice (Assigned).

This is an appeal from a conviction for burglary of a habitation with intent to commit a felony, to-wit: aggravated assault. TEX.PENAL CODE ANN. § 30.02(a)(1) (Vernon 1989). Following the jury's verdict of guilty, the court assessed punishment at confinement for five years in the

---

**1.** Assigned to this case by the Chief Justice of the Supreme Court of Texas pursuant to TEX. GOV'T CODE ANN. § 74.003(b) (Vernon 1989).

Texas Department of Corrections, probated.

In his sole point of error, the appellant challenges the sufficiency of the evidence to support his conviction. He particularly urges the evidence was insufficient to show the burglary offense was committed with intent to commit the felony of aggravated assault by causing serious bodily injury as alleged and as submitted to the jury.

Amado Martinez, a college student, testified he was 20 years old at the time of the alleged offense; that on the night of January 30, 1988, he went to several parties with a college friend; that at the parties he encountered a girl he knew by the name of Sandra; that he learned Sandra lived at the Greystone Apartment complex in San Antonio where he also lived with his mother; that he and his friend and Sandra and her girlfriend proceeded in separate cars to the apartment complex after they all left the last party; that he talked to Sandra and her friend there and then took his friend home, and stopped at a Taco Cabana to take food home; that upon arriving home about 2:30 a.m. on January 31 he visited with his mother; that thereafter he went to his bedroom and began to watch television.

Martinez revealed that later he observed a car without its headlights on pull up near his bedroom window. He then saw three men, unknown to him, walking toward his car in the well-lighted parking lot. He became suspicious and raised a window (apparently almost at ground level) and inquired of the men as to "their problem." One of the men replied, "We are going to kick your ass." Martinez testified the appellant and one of the other men kicked in the window screen, busted the windowsill and entered the bedroom. They began to hit him, pushing him onto the bed where the attack continued. The appellant was on top of Martinez hitting him in the face with his fist. Martinez recalled the men saying again that they were going to "kick his ass" and "beat the shit out of you." Martinez began to yell for help asking the men to stop beating him. His mother came to the room and screamed. She then ran for help. Thereafter, plainclothes police officers entered the bedroom and yelled "Police, freeze." Martinez revealed that at this point the appellant and the other man fled through the broken window. He saw the appellant take a VCR as the appellant left. Martinez stated that some twenty or thirty minutes later the police returned the appellant to the apartment where he identified the appellant as his assailant. The VCR was also recovered.

On cross-examination Amado Martinez denied he had bothered or harassed Sandra or her friend at the parties, or followed them from party to party or to the apartment complex. He admitted that he had knocked at their apartment door after they had returned from the parties, but stated he left when some man answered the door and told him the girls were asleep.

Scharlotte Sue Martinez, mother of Amado, corroborated his arrival at home about 2:30 a.m., and related she was later awakened by loud voices and glass breaking, and went to her son's room where she saw him being beaten by two men. She ran to a neighbor's apartment and asked him to call the police; that two apartment security officers quickly appeared and she pointed to her son's room; that the two men ran when the officers entered the room. She found her son with "blood all over him" and his eyes and face already swelling; she testified that every pane of glass in both windows of the bedroom had been broken and the screen "kicked in." She testified that all the glass was inside the bedroom; that the VCR taken was returned by the police; that she took pictures of her son later in the day at 10:00 a.m. depicting his condition. Post-assault photographs of Amado were introduced into evidence. She testified she did not give the appellant or the other men permission to break and enter the apartment in which she lived with her son.

San Antonio Police Officer R. Sanchez was off-duty at the time of the alleged offense. He lived at the apartment complex and was its security officer. He was outside his apartment preparing to take home another officer, Michael Oliva, when he heard breaking glass and screaming and

yelling. He stated that he and Oliva went to an apartment about thirty yards away where they found a hysterical woman pointing to the inside of her apartment; that upon entering the bedroom he saw "people" in there fighting; that when he identified himself as a police officer people began climbing out the window, with one of them picking up a VCR as he left. Sanchez followed the men out the window, and Oliva joined the chase. Sanchez related that the appellant fell over a curb, and he fell on top of him; that they struggled and Officer Oliva assisted in appellant's arrest. The others eluded capture. The VCR was found abandoned. Sanchez did not know which one of the men had taken the VCR. After taking Officer Oliva home, Sanchez observed that one of the other men they had been chasing was hitchhiking. He stopped and apprehended Arthur "Sonny" Martinez (no relation to Amado) who had blood on his shirt. Officer Oliva generally corroborated Sanchez's testimony as to occurrences at the scene.

Officer Gary Albrecht, an on-duty officer, testified he arrived on the scene, and took custody of the appellant; that he observed Amado Martinez who had a "badly swollen right eye and several bruises on his face"; that everything in the bedroom had been knocked over, and that both windows had been broken out with glass inside on the floor; that the window frames had been pushed in, bent inward.

Marlene Martinez testified for the defense. She stated that a friend, Sandra Solis, lived with her and her mother in the Greystone Apartments; that she and Sandra went to several parties on January 30, 1988, where they encountered Amado Martinez (no relation) and his friend who continued to bother and harass them, followed them from one party to another, followed them to a Taco Cabana, and then to the apartment complex where they tried to talk to them again. Marlene testified her mother was not home and she called a friend, Roy Cisneros, to come to the apartment. Roy was there when Amado Martinez knocked on the door the second time. Shortly thereafter she received a call from a cousin, Robert Salinas, who told her his car had stalled, and asked her to pick up him and two of his friends. When they left the apartment they found that Sandra's car, which they had been using, had a flat tire. Roy Cisneros took the girls in his car. At a service station they found Salinas was in the company of the appellant and Arthur "Sonny" Martinez. During their return to the apartment complex Marlene recounted her difficulties with Amado Martinez. After arrival the girls went to the apartment.

Cisneros testified that after their return he and the appellant drove around the apartment complex and located Amado Martinez's car and saw him in an apartment window. They returned to pick up the other two men and came back. Cisneros testified he remained in the car, and the other three men approached the apartment with the appellant telling Amado Martinez they needed to talk to him; that this was answered with cussing and swearing; that a screen flew off and hit one of the approaching men; that it appeared Amado Martinez pulled the appellant inside the apartment through the window; that a fight took place inside the room, and when a voice from the apartment said, "Go ahead, take off," he left. As he drove away he heard gunshots.

Robert Salinas testified that he had been the one to tell Amado Martinez they wanted to talk to him; that as they approached the bedroom window Amado Martinez pushed out the window screen, stepped outside, hit Sonny Martinez with the screen, and hit the appellant with his fist; and that Amado appeared to pull the appellant into the room, although he later saw the appellant hitting Amado. He acknowledged that he had kicked out one of the windows, and that it was Sonny Martinez who used a brick to shatter the windshield on Amado's car. Salinas did not see Sonny Martinez enter the apartment but saw him running with the VCR after someone yelled "freeze." Salinas revealed that as he fled from the scene he heard four shots fired. He ran to his cousin's apartment nearby and spent the night there.

Testifying in his own behalf, the appellant stated that as they approached the

bedroom window Amado Martinez stepped out, hit Sonny Martinez with the screen and struck him in the face with a fist; that he struggled with Amado and ended up inside the bedroom and fighting on the top of the bed. He admitted he was hitting Amado. The record then reflects:

Q: Was he hitting you back?

A: He was trying.

Appellant revealed that when Salinas told him to leave he had to punch Amado "a couple more times so he would let me go"; that he left of his own accord. He stated he was the only one of his group in the bedroom, although he later "felt" someone else was in the bedroom, and he was sure it was Sonny Martinez who had the VCR in his hands when they were leaving the bedroom. He stated he had no intent to steal or to burglarize but only to talk to the man who had been harassing Marlene Martinez.

On cross-examination appellant revealed that as he ran from the scene he heard four shots and he tripped on a curb; that a man approached him, kneed and hit him; that he didn't know the man was an officer, and he punched the man in the face knocking him down, but another man appeared and told him, "Don't move."

TEX.PENAL CODE ANN. § 30.02(a)(1) (Vernon 1989) provides:

(a) A person commits an offense if, without the effective consent of the owner, he:

(1) enters a habitation, or a building (or any portion of a building) not then open to the public, with intent to commit a felony or theft; ...

The instant indictment contained two counts. The first alleged burglary of a habitation with intent to commit theft. The second alleged burglary of a habitation with intent to commit the "felony of aggravated assault." At the conclusion of the guilt stage of the trial the State waived and abandoned the first count of the indictment. The court submitted the case to the jury under the second count.

TEX.PENAL CODE ANN. § 22.02 (Vernon 1989 & Vernon Supp.1990) provides in part:

(a) A person commits an offense if the person commits assault as defined in Section 22.01 of this code [assault] and the person:

(1) causes serious bodily injury to another, including the person's spouse;

...

TEX.PENAL CODE ANN. § 1.07(a)(7) (Vernon 1989) provides that " '[b]odily injury' means physical pain, illness, or any impairment of physical condition." TEX. PENAL CODE ANN. § 1.07(a)(34) (Vernon 1989) provides that " '[s]erious bodily injury' means bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ."

Having defined aggravated assault (using its first mode) and "serious bodily injury" in the jury charge, the court applied the law to the facts requiring the jury before conviction, to find beyond a reasonable doubt that the appellant had committed the burglary of a habitation as alleged, without the effective consent of the owner, and "at the time of such entry, if any there was, had the intent then and there to commit the specific crime of aggravated assault, as the term is herein defined, then you will find the defendant guilty as charged in the indictment."

It is appellant's contention that the burglary conviction cannot stand because the evidence is insufficient to sustain an element of the offense—that he had the intent to commit aggravated assault by causing serious bodily injury.

■ If a burglarious entry is made with the intent to commit a felony or theft, the offense of burglary with intent to commit a felony or theft is complete, whether any felony or the crime of theft ever subsequently happens. *Garcia v. State*, 571 S.W.2d 896, 899 (Tex.Crim.App.1978). *See also Robles v. State*, 664 S.W.2d 91, 95 (Tex.Crim.App.1984) (Clinton, J., concurring); *Ford v. State*, 632 S.W.2d 151, 153 (Tex.Crim.App.1982). Thus, the actual commission of the contemplated crime need not be established. The accused may be found guilty of burglary although no prop-

erty is taken or any felony committed. 20 TEX.JUR.3d *Criminal Law* § 892 (1982). The question is not whether appellant actually caused serious bodily injury to Amado Martinez but whether evidence is sufficient to show he had the requisite intent at the time of the entry into the habitation.

Intent is a fact issue for the jury. *Robles v. State*, 664 S.W.2d 91, 94 (Tex. Crim.App.1984); *Marinez v. State*, 654 S.W.2d 500, 502 (Tex.App.—Corpus Christi 1983, no pet.). Proof of a culpable mental state generally relies upon circumstantial evidence. *Dillon v. State*, 574 S.W.2d 92, 94 (Tex.Crim.App.1978); *Clark v. State*, 543 S.W.2d 125, 127 (Tex.Crim.App.1976). Intent can be inferred from the acts, words and conduct of the accused, and is to be resolved by the trier of fact from all of the facts and the surrounding circumstances. *Dues v. State*, 634 S.W.2d 304, 305 (Tex. Crim.App.1982); *Mauldin v. State*, 628 S.W.2d 793, 795 (Tex.Crim.App.1982).

The intent with which entry is made in a burglary case is an essential element of the offense. The intent alleged must therefore be proved beyond a reasonable doubt by the facts and circumstances. It may not be left simply to speculation and surmise. *LaPoint v. State*, 750 S.W.2d 180, 181 (Tex. Crim.App.1986); *Greer v. State*, 437 S.W.2d 558, 559–60 (Tex.Crim.App.1969).

We have found three recent cases involving burglary with intent to commit aggravated assault. They are instructive, but none of the opinions reveals what manner or mode of aggravated assault was involved. In *Williamson v. State*, 716 S.W.2d 591 (Tex.App.—Corpus Christi 1986, pet. ref'd), a conviction for burglary of a habitation was upheld. There the defendant forcefully entered the house and shouted "I want to kill Eddie." He knocked the occupant of the home unconscious, and held him by the throat with a gun pointed at his head. In *Lewis v. State*, 638 S.W.2d 148, 151 (Tex.App.—El Paso 1982, pet. ref'd) the evidence was held insufficient to support a conviction for habitation burglary with intent to commit aggravated assault. The evidence showed a burglary with the intent to commit theft,

interrupted by the arrival of the owner which resulted in a violent confrontation. In *Perez v. State*, 629 S.W.2d 834 (Tex.App. —Austin 1982, no pet.) a similar conviction was upheld. There the evidence showed that the defendant with four co-defendants forcefully entered the home of the victim's father, and the victim was beaten, kicked and stabbed to death; and there was evidence that the defendant joined his companions in kicking the victim. There the evidence was held sufficient to show the habitation burglary was with intent to commit aggravated assault, notwithstanding evidence to the contrary on the question of the defendant's participation and intent.

In reviewing the sufficiency of the evidence to sustain the conviction this court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 n. 12, 99 S.Ct. 2781, 2789 n. 12, 61 L.Ed.2d 560 (1979); *Butler v. State*, 769 S.W.2d 234, 239 (Tex.Crim.App.1989); *Dickey v. State*, 693 S.W.2d 386, 387 (Tex.Crim.App.1984); *Carlsen v. State*, 654 S.W.2d 444 (Tex. Crim.App.1983). The standard for review is the same in both direct and circumstantial evidence cases. *Chambers v. State*, 711 S.W.2d 240, 245 (Tex.Crim.App.1986); *Christian v. State*, 686 S.W.2d 930, 934 (Tex.Crim.App.1985); *Houston v. State*, 663 S.W.2d 455, 456 (Tex.Crim.App.1984).

A conviction based on circumstantial evidence, however, cannot be sustained if the circumstances do not exclude every other reasonable hypothesis except that of the defendant's guilt. *Butler v. State*, 769 S.W.2d 234, 239 (Tex.Crim.App.1989); *Humason v. State*, 728 S.W.2d 363, 366 (Tex. Crim.App.1987). If, after viewing the evidence in the light most favorable to the jury's verdict, there is a reasonable hypothesis other than the guilt of the accused, then it cannot be said that the guilt has been shown beyond a reasonable doubt. *Martin v. State*, 753 S.W.2d 384, 387 (Tex. Crim.App.1988); *Anderson v. State*, 701 S.W.2d 868, 872 (Tex.Crim.App.1985).

Jurors are triers of the facts, the judges of the credibility of the witnesses and the weight to be given to their testimony. TEX.CODE CRIM.PROC.ANN. art. 38.04 (Vernon 1979); *see Miller v. State,* 566 S.W.2d 614, 618 (Tex.Crim.App.1978). The jury is entitled to accept or reject all or any part of the testimony given by the witnesses for the State and the accused. *See Beardsley v. State,* 738 S.W.2d 681 (Tex. Crim.App.1987); *Bowden v. State,* 628 S.W.2d 782 (Tex.Crim.App.1982). Reconciliation of evidentiary conflicts is solely a function of the trier of fact. *Banks v. State,* 510 S.W.2d 592, 595 (Tex.Crim.App. 1974).

■ Clearly the evidence shows a forceful entry into the home of Sue Martinez without her effective consent. The record shows that when the appellant arrived at the apartment complex in the early morning hours, he and Cisneros began a search to locate Amado Martinez. Once he was located, reinforcements were sought. When appellant and two others approached the apartment window Amado Martinez was told that they had come to "kick his ass." After the entry that threat was repeated, and Amado Martinez was also told their purpose was to "beat the shit" out of him. According to appellant's own testimony he was the only one who had entered the bedroom at the time. Appellant admitted he was "about five [feet] ten and a half, maybe five eleven [inches]" tall, and weighed 160 pounds. He had been active in school sports. Amado Martinez was shown to be five feet, six inches tall and weighed 110 pounds. Although the evidence does not reflect the use of weapons, the larger man beat the smaller man about the face and particularly the eyes while on top of the smaller man. When asked if Amado Martinez was "hitting back," appellant replied that Martinez "was trying." Despite the appearance of Martinez's mother in the bedroom and her screams, the appellant continued his assault upon the smaller man, which was terminated only upon the arrival of the police. In his flight from the scene appellant testified he punched an officer in the face knocking the officer down. Amado Martinez was shown to have been covered with blood, with a badly-swollen right eye (impairment of the function of an organ of the body), and bruises on his face. Although no medical evidence was offered the State was not required to prove that serious bodily injury was actually caused.

We conclude, viewing the evidence in the light most favorable to the jury's verdict, as we are required to do, that any rational trier of fact could have found beyond a reasonable doubt each and every essential element of the offense charged and as submitted to the jury. Appellant's point of error is overruled.

The judgment of conviction is affirmed.