**Robert G. BARCENES, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 04–94–00311–CR.**

Court of Appeals of Texas,
San Antonio.

Feb. 12, 1997.

Discretionary Review Refused
May 14, 1997.

Anthony B. Cantrell, San Antonio, for Appellant.

Daniel Thornberry, Assistant Criminal District Attorney, San Antonio, for Appellee.

Before LÓPEZ, STONE and DUNCAN, JJ.

## OPINION

STONE, Justice.

Appellant, Robert G. Barcenas, was indicted for the murder of Troy Symm, the nine-

teen month old son of appellant's girlfriend. A jury found appellant guilty and sentenced him to 50 years in prison. On appeal appellant complains of charge error, insufficiency of the evidence, exclusion of evidence, and improper jury argument. Finding sufficient evidence to support the verdict and no harmful error, we affirm the trial court's judgment.

## Factual Background

Because appellant challenges the sufficiency of the evidence to support his conviction, a review of the facts is necessary.

### A. The Scene of the Injury

Joanne Martinez testified that at approximately 1:00 a.m. on June 28, 1992, she was at her trailer home when she heard appellant, a neighbor, banging on her door asking for her husband. Appellant was carrying young Troy Symm, whom Mrs. Martinez described as stiff, with closed eyes and blood coming out of the corner of his mouth. Joanne's husband, Joe Martinez, also testified that when appellant brought the baby into the trailer the child was "stiff as a board" and exhibited no movement; his eyes had rolled back and his hands were cupped. Appellant told the couple that the baby had followed him out of the trailer when he was taking out the garbage and had fallen off a step onto the concrete patio and injured himself.

While Mr. Martinez called EMS, Mrs. Martinez unsuccessfully attempted to revive the child with CPR. Appellant then asked Mrs. Martinez to watch Troy while appellant went outside to smoke. EMS personnel arrived shortly thereafter. Appellant asked to use the restroom, and according to Mrs. Martinez, he never came out to offer any assistance. Nor did appellant approach Troy's mother, Modene Symm, when she arrived at the scene.[1]

After the child was removed by EMS, the Martinezes found appellant in their unlit utility room. When Mr. Martinez told appellant that he needed to go outside to speak with a deputy, appellant replied "Don't tell them

I'm here." Appellant left when Martinez told him to leave.

Sheriff's Deputy Monty Fox testified that he was dispatched to the scene for an injured child call. When he arrived at the Martinez home he saw a young child, later identified as Troy Symm, clothed only in a diaper, lying on the floor. Troy had a bloody lip and a red spot on his head, his eyes were rolled up, and he appeared to be suffering from a seizure. Modene Symm told Fox that her son was being cared for by a babysitter. Fox then spoke with appellant, who identified himself as the sitter. Appellant showed the deputy the single concrete step at the trailer's entrance where the injury had occurred. Appellant stated that when he took out the trash, Troy apparently followed him, fell backwards off a step, and hit his head on a concrete slab. When Troy began to cry appellant carried him into the trailer and placed him on the floor. Appellant said that Troy tried to walk, but fell on his face, causing a bloody lip. Troy became completely limp when appellant picked him up. Appellant said he then ran to the Martinez's trailer because he did not have a telephone.

Thomas Winn, the chief of the Windcrest Voluntary Fire Department, was the first emergency medical technician on the scene. He found Troy laying in the middle of the floor with his arms rotating laterally, a condition called "decerebrate posturing." Troy's eyes were dilated and nonreactive, suggesting a severe head injury. Troy "seized" each time he was touched, and he occasionally moaned and lapsed back into unconsciousness. Winn said he had never encountered such a severe head injury before.

### B. Lay Witnesses at the Hospital

Modene Symm's co-worker, Nora Lopez, testified that she had seen Troy about twelve hours before his injury and that he was fine and active. She knew that appellant babysat Troy while Symm worked evenings at a restaurant. Restaurant records established that Symm was at work from 5:20 p.m. on June 27 until 1:20 a.m. on June 28, 1992. Sometime after Symm left work, she tele-

---

1. Mrs. Martinez was under the impression that Symm and appellant were married because she had seen appellant living at Symm's trailer and had seen him taking care of the baby.

phoned Lopez and asked her to drive appellant to the hospital because the doctors needed to speak with him. On their way to the hospital, appellant indicated to Lopez that the baby was doing poorly. Appellant again described how Troy slipped and fell while appellant was taking out the garbage. Appellant also told Lopez that earlier in the day while he was babysitting, a television fell on Troy when Troy pulled on the cord. Appellant said that he had not contacted Symm or taken Troy to the hospital because the baby was laughing and he did not think the injury was serious.

Cynthia Cruz, Troy's previous babysitter, testified that she went to the hospital on the night of Troy's injury. Appellant told Cruz that Troy had been injured when he fell off the trailer step when appellant was taking out the garbage. Cruz testified, however, that appellant asked her to help him establish an alibi by saying that she, not appellant, was with Troy at the time of the fall. Cruz stated that appellant showed no remorse or sorrow, and she felt that he was squinting his eyes to produce tears.

### C. The Medical Testimony

Troy was brought to Brooke Army Medical Center (BAMC) for treatment. Pamela Ruggiero, an Army officer and clinical social worker with BAMC, testified that appellant told her that Troy had been injured while appellant was taking out the garbage. Appellant never mentioned that Troy was prone to falls or had balance problems. Ruggiero questioned appellant's demeanor, noting he did not look sincere or genuine, and that he told his story in a very practiced manner. Four days after his arrival at BAMC Troy Symm was declared brain dead. He was removed from a ventilator and died shortly thereafter.

Dr. Stephen Klein, a board certified neurosurgeon with extensive experience in pediatric head injuries, treated Troy at BAMC. Dr. Klein arrived at the hospital within 30 minutes of Troy's admission to the emergency room and found Troy comatose and very close to being dead. Dr. Klein's examination revealed an old bruise on Troy's forehead, and several indications of a massive, recent head injury. The child had decerebrate posturing or bilateral rotating of the fists, suggesting a brain stem injury. Retinal hemorrhaging and subdural hematomas, both caused by head injury, were also present. Dr. Klein noted that Troy was suffering from massive swelling of the brain, a potentially fatal injury. The child also had multiple bruises on his scalp in various stages of healing. Dr. Klein further noted that there was no evidence that a heavy object such as a television set had fallen on Troy. Dr. Klein also testified that Troy's injuries could not have been caused by an accident like the fall down a step described by appellant. He concluded that Troy had been . hit with a blunt object or thrown against a blunt surface.

Dr. Robert Bux, the Bexar County Deputy Chief Medical Examiner who performed the autopsy on Troy, also concluded that Troy's massive brain stem injury was caused by being struck by a blunt object or thrown against a blunt surface. Dr. Bux stated that the presence of bruises, subdural hematomas, and bilateral retinal hemorrhaging, precluded the possibility of a fall as the cause of Troy's injuries.

Dr. Nancy Kellogg, an assistant professor of Pediatrics with the University of Texas Health Science Center specializing in child abuse and neglect cases, testified for the State. Dr. Kellog excluded a fall off a step as a possible cause of Troy's death, and agreed with Doctors Klein and Bux that because of the type of injuries inflicted on Troy, he would have been immediately symptomatic, i.e., seizing or immediately losing consciousness. She also agreed that falls produce fatal injuries only from much greater heights measuring several stories high.

### D. The Defense Witnesses

Appellant testified in his own behalf and denied killing Troy. He stated that he and Modene Symm began living together shortly after they met in February, 1991. He claimed that he loved Troy like his own son, and that he spent more time with Troy than Symm did. He described Troy as clumsy and prone to falling and banging his head. Appellant estimated that Troy fell as many

as three or four times a day. He also testified that a week before his death, Troy fell out of a truck and hit his head. Troy received no medical treatment for the fall, but he had previously received medical attention for ear infections. Symm and appellant were never advised that Troy might have any balance problems.

Appellant stated that Troy was feverish and sluggish on the day of the injury, and that he had a few minor falls that day. Appellant also stated that on the morning of June 27, he briefly left the trailer and returned to find Troy on the floor with a 30 to 40 pound television set on his stomach, and his head against a wall. Appellant lifted the television set off Troy's stomach and checked his ribs, which caused Troy to laugh.

Appellant was home alone with Troy sometime between 11:00 p.m. and midnight when Troy fell asleep on the sofa. Appellant left the trailer to take out the garbage. After exiting the trailer, he heard Troy falling. He turned and found Troy on the ground, crying. Appellant thought Troy had fallen off the concrete step. He brought Troy inside the trailer and set him on the floor. Troy tried to walk but fell and cut his lip. Troy then seemed to turn blue, and appellant unsuccessfully tried to administer CPR. Although Troy appeared to revive, his eyes rolled back. Appellant tried to awaken Troy, and then ran with him to the Martinez's trailer for help. He did not remember the child becoming stiff or exhibiting the "decerebrate posturing"noted by other witnesses. Appellant denied hiding at the Martinez's trailer. He claimed that he kept out of the way on the instructions of Modene Symm.

Appellant's mother, Rose Gonzales, testified that appellant, Modene Symm, and Troy had lived with her on several occasions. She testified that her son cared for Troy while Symm was at work. She described Troy as accident prone, active, and clumsy. She claimed Troy fell frequently, banged his head on the floor, and ran into the edge of doors. Gonzales remembered telling Symm and her son to take Troy to the doctor because of his falls, which Symm never did. She was also aware that Troy had recently fallen from a truck. Gonzales stated that when she saw

Troy earlier on June 27, he was bruised and not as active as usual.

Two of appellant's brothers and the fiancée of one of the brothers testified that Troy was clumsy and frequently fell. These three individuals all testified that in the week prior to his death, Troy seemed quiet and somewhat listless.

## The Jury Charge

In his first point of error appellant claims the trial court erred in submitting a jury charge that failed to limit the definitions of "knowingly"and "intentionally" to the result of appellant's conduct.

The definitional portion of the court's jury charge tracked the language of TEX. PENAL CODE ANN. § 6.03(a) (Vernon 1994), and defined "intentionally" and "knowingly" as follows:

A person acts intentionally, or with intent, with respect *to the nature of his conduct* or to a result of his conduct when it is his conscious objective or desire to *engage in the conduct* or cause the result.

*A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist.* A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

(Emphasis added). Appellant objected at trial, claiming the italicized portions of these definitions should not have been shown to the jury. The court overruled the objection that the definitions should be limited to their result only language.

■■■ When a defendant is charged with a result oriented crime, as in the instant case, he is entitled on request to have the abstract definitions of "intentionally and knowingly" limited to the result only language. *See Cook v. State,* 884 S.W.2d 485, 490–91 (Tex.Crim.App.1994); *Alvarado v. State,* 704 S.W.2d 36, 39–40 (Tex.Crim.App.1986)(opinion on rehearing). Since appellant was charged with a "result of conduct" offense, the trial judge erred in not

limiting the culpable mental states to the result of appellant's conduct. *See Cook,* 884 S.W.2d at 491. Not every error in the charge requires reversal, however. *Almanza v. State,* 686 S.W.2d 157, 171 (Tex.Crim. App.1985). We must conduct a harm analysis to determine if this error requires reversal of appellant's conviction. In assessing harm from the inclusion of improper elements in the definitions of culpable mental states, we "may consider the degree, if any, to which the culpable mental states were limited by the application portions of the jury charge." *Hughes v. State,* 897 S.W.2d 285, 296 (Tex.Crim.App.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1967, 131 L.Ed.2d 857 (1995) (quoting *Cook,* 884 S.W.2d at 492 n. 6). The application paragraph in this case, and the definitions of "intentionally"and "knowingly," are nearly identical to those in *Hughes,* 897 S.W.2d at 296. There the court noted that although the definitions of "intentionally" and "knowingly" set forth three alternative elements of conduct, when viewed in their factual context it was apparent which conduct element applied to the offense. *Id.* The court concluded:

> [B]ecause the facts, as applied to the law in the application paragraph, pointed the jury to the appropriate portion of the definitions, no harm resulted from the court's failure to limit the definitions of culpable mental states....

*Id.* at 296–97; *see also Patrick v. State,* 906 S.W.2d 481, 491–93 (Tex.Crim.App.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1323, 134 L.Ed.2d 475 (1996); *Navarro v. State,* 863 S.W.2d 191, 196 (Tex.App.—Austin 1993), *aff'd,* 891 S.W.2d 648 (Tex.Crim.App.1995).

Likewise in this case, the application paragraph specified that appellant had to have intentionally and knowingly "caused" Troy's death. Thus the facts, as applied to the law in the application paragraph, pointed the jury to the proper result oriented culpable mental state portion of the definitions. Consequently, no harm resulted from the court's failure to limit the definitions of "intentionally" and "knowingly" to the result of appellant's conduct. Appellant's first point of error is overruled.

## Sufficiency of the Evidence

Appellant's second point of error claims the evidence is insufficient to support his murder conviction. Specifically, appellant claims there is insufficient evidence to prove that he intended to cause Troy's death or that his conduct actually caused Troy's death. Neither argument is persuasive.

The standard of review for the sufficiency of the evidence is whether, viewing all of the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the offense proven beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 318, 99 S.Ct. 2781, 2788, 61 L.Ed.2d 560 (1979); *Geesa v. State,* 820 S.W.2d 154, 156 (Tex.Crim. App.1991). The standard of review is the same in both direct and circumstantial evidence cases. *See Geesa,* 820 S.W.2d at 156; *Kapuscinski v. State,* 878 S.W.2d 248, 249 (Tex.App.—San Antonio 1994, pet. ref'd).

The jury, as the trier of fact, is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *See Sharp v. State,* 707 S.W.2d 611, 614 (Tex. Crim.App.1986), *cert. denied,* 488 U.S. 872, 109 S.Ct. 190, 102 L.Ed.2d 159 (1988); *Vanderbilt v. State,* 629 S.W.2d 709, 716 (Tex. Crim.App.1981), *cert. denied,* 456 U.S. 910, 102 S.Ct. 1760, 72 L.Ed.2d 169 (1982). The jurors are also entitled "to draw reasonable inferences from basic facts to ultimate facts." *Kapuscinski,* 878 S.W.2d at 249 (citing *Dumas v. State,* 812 S.W.2d 611, 615 (Tex. App.—Dallas 1991, pet. ref'd)). Moreover, the sufficiency of the evidence is determined from the cumulative effect of all the evidence; each fact in isolation need not establish the guilt of the accused. *Alexander v. State,* 740 S.W.2d 749, 758 (Tex.Crim.App.1987); *see Russell v. State,* 665 S.W.2d 771, 776 (Tex. Crim.App.1983), *cert. denied,* 465 U.S. 1073, 104 S.Ct. 1428, 79 L.Ed.2d 752 (1984).

Intent is a fact issue for the jury to resolve. *See Robles v. State,* 664 S.W.2d 91, 94 (Tex.Crim.App.1984); *Rodriguez v. State,* 793 S.W.2d 744, 748 (Tex.App.—San Antonio 1990, no pet.). A culpable mental state generally must be established by circumstantial evidence, and may be inferred from the acts,

words, and conduct of the accused. *Dues v. State*, 634 S.W.2d 304, 305 (Tex.Crim.App. [Panel Op.] 1982); *Rodriguez*, 793 S.W.2d at 748. Proof of causation is sufficient if the evidence establishes that "but for" the defendant's conduct, the alleged result would not have occurred. *See Lowe v. State*, 676 S.W.2d 658, 661 (Tex.App.—Houston [1st Dist.] 1984, pet. ref'd); *see also* TEX. PENAL CODE ANN. § 6.04(a) (Vernon 1994). Cause of death can be established both by expert medical testimony, *see Barrera v. State*, 756 S.W.2d 884, 885 (Tex.App.—San Antonio 1988, pet. ref'd), and by circumstantial evidence. *See Hines v. State*, 515 S.W.2d 670, 673 (Tex.Crim.App.1974).

■ The trial court submitted the following application paragraph to the jury:

Now if you find from the evidence beyond a reasonable doubt that on or about the 2nd day of July, A.D., 1992 in Bexar County, Texas, the defendant, Robert G. Barcenas, did intentionally or knowingly cause the death of an individual, Troy Symm, by striking Troy Symm with a blunt object unknown to the Grand Jury or by throwing Troy Symm against a blunt object unknown to the Grand Jury, then you will find the defendant guilty of murder as charged in the indictment.

Unless you so find beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will find the defendant not guilty.

After carefully reviewing the record as outlined above, we are persuaded the jury could have reasonably concluded that Troy Symm died as a result of a massive blunt trauma to the head. Appellant had sole custody and care of Troy at the time the injuries occurred. He attempted to cover up this fact when he asked Cynthia Cruz to say that she was caring for Troy at the time he was injured. His version of how the injuries were sustained was discredited by all expert medical evidence. This evidence is sufficient to support the jury's finding that appellant intentionally caused Troy's death in the manner alleged in the indictment. *See Sandow v. State*, 787 S.W.2d 588, 598–99 (Tex.App.—Austin 1990, pet. ref'd); *Gale v. State*, 747 S.W.2d 564, 565–566 (Tex.App.—Fort Worth 1988, no pet.). Appellant's second point of error is therefore overruled.

**Lesser Included Offenses**

■ Appellant's third and fourth points of error claim the trial court erred in refusing to submit instructions on the lesser included offenses of criminally negligent homicide and involuntary manslaughter. We must determine whether there is evidence in this record that would have permitted the jury to rationally find appellant guilty only of a lesser included offense.

In order for a defendant to be entitled to a lesser included offense instruction he must satisfy a two-prong test. First, the offense requested must be a lesser included offense of the indicted offense. Second, there must be some evidence in the record that the defendant, if guilty, is guilty only of the lesser included offense. *Ross v. State*, 861 S.W.2d 870, 876 (Tex.Crim.App.1993)(opinion on rehearing). This evidence can come from any source, however weak or controverted. *See Hobson v. State*, 644 S.W.2d 473, 477 (Tex.Crim.App.1983). Isolated facts taken out of context from the record will not justify a lesser included offense instruction. *See Ramos v. State*, 865 S.W.2d 463, 465 (Tex. Crim.App.1993).

We begin with the statutory definitions. The offense of involuntary manslaughter occurs when a person recklessly causes the death of an individual. TEX. PENAL CODE ANN. § 19.04(a) (Vernon 1994). Criminally negligent homicide occurs when a person causes the death of an individual by criminal negligence. TEX. PENAL CODE ANN. § 19.05(a) (Vernon 1994).

Whether appellant was entitled to either of the lesser included offense instructions turns on what constitutes recklessness and criminal negligence. These terms are defined in the Texas Penal Code as follows:

(c) A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a

nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

(d) A person acts with criminal negligence, or is criminally negligent, with respect to circumstances surrounding his conduct or the result of his conduct when he ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

TEX. PENAL CODE ANN. § 6.03(c), (d) (Vernon 1994). The difference between involuntary manslaughter and criminally negligent homicide is the culpable mental state required for each offense: recklessness for the former and criminal negligence for the latter. *Thomas v. State,* 699 S.W.2d 845, 849 (Tex. Crim.App.1985); *Nash v. State,* 664 S.W.2d 343, 344 (Tex.Crim.App.1984). The difference between these culpable mental states was explained in *Lewis v. State,* 529 S.W.2d 550, 553 (Tex.Crim.App.1975):

> Reckless conduct as defined by V.T.C.A. Penal Code, Sec. 6.03(c), involves conscious risk creation, that is, the actor is aware of the risk surrounding his conduct or the results thereof, but consciously disregards that risk. Criminal negligence as defined by V.T.C.A. Penal Code, Sec. 6.03(d), involves inattentive risk creation, that is, the actor ought to be aware of the risk surrounding his conduct or the result thereof. At the heart of reckless conduct is conscious disregard of the risk created by the actor's conduct; the key to criminal negligence is found in the failure of the actor to perceive the risk. As defined, criminal negligence is a lesser culpable mental state than recklessness; mere proof of criminal negligence would not suffice to support a conviction for the offense of involuntary manslaughter.

The two culpable mental states both require evidence of a "substantial and unjustifiable risk that ... the result will occur," and that the accused's failure to perceive or conscious disregard of that risk is a "gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint." *Thomas,* 699 S.W.2d at 849. But it is the failure to perceive the risk that distinguishes criminally negligent homicide from involuntary manslaughter. *Nash,* 664 S.W.2d at 345.

To support his claim that the trial court should have charged the jury on criminal negligence and involuntary manslaughter, appellant points to two passages from his testimony in which he said: (1) he had erred in failing to lock the door to the trailer, or check whether Troy was asleep; and (2) he had no idea Troy would die from a fall, and had not knowingly or intentionally killed Troy.

This evidence does not raise an issue of whether appellant was aware of, but ignored, a risk of death. As a result, the lesser included offense of involuntary manslaughter, which is based on conscious risk taking, is not raised by the evidence. Likewise, there is no evidence that appellant's self-described conduct subjected Troy to an objectively substantial and unjustifiable risk of death. The medical testimony proffered by the State's witnesses affirmatively excluded a fall on a concrete step as a possible cause of Troy's fatal injuries. Similarly, the defense testimony that Troy was prone to falls did not raise an issue of substantial risk of death, since Troy had survived each of these alleged prior falls. At most, Troy was unusually subdued a few days before his death. This evidence would not have placed a reasonable person on notice that Troy would die as a result of yet another fall caused by appellant's failure to lock a door or check on whether Troy was asleep.

In the absence of evidence of conscious risk taking, involuntary manslaughter was not raised by the evidence. Without evidence of a substantial risk of death from a fall onto a concrete step resulting from a failure to lock a door or to determine whether Troy was sleeping, neither involuntary manslaughter nor criminally negligent homi-

cide was raised by the evidence. *Thomas,* 699 S.W.2d at 849; *Nash,* 664 S.W.2d at 345. Thus, the trial court did not err when it refused to submit these instructions to the jury. Appellant's third and fourth points of error are overruled.

### Exclusion of Evidence

■ In his fifth point of error, appellant alleges the trial court erred in refusing to allow him to call Modene Symm to testify. In a hearing held outside the presence of the jury, Symm testified that she was under indictment for the death of her child, and asserted her privilege against self-incrimination. The trial court ruled that appellant could not call Symm to testify. Appellant made an offer of proof of the questions he sought to ask Symm, and indicated that he did not intend to question her about extraneous offenses, including the charge against her of "a felony offense of injury to a child by omission." The State introduced Symm's statement to the police as a bill of exception for the appellate record.

A defendant's right to compulsory process under the Sixth Amendment does not override a potential witness' Fifth Amendment privilege against self-incrimination. *Grayson v. State,* 684 S.W.2d 691, 696 n. 2 (Tex.Crim. App.1984); *Keller v. State,* 662 S.W.2d 362, 364–65 (Tex.Crim.App.1984). A witness can claim the privilege if she reasonably believes or has reason to believe that an answer may incriminate her. *See Hoffman v. United States,* 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951). Even when an answer does not appear to be incriminating, a witness may claim the privilege if the answer might provide a link in the chain of evidence to establish guilt, or has a tendency to establish guilt. *See Blau v. United States,* 340 U.S. 159, 161, 71 S.Ct. 223, 224, 95 L.Ed. 170 (1950); *United States v. Whittington,* 786 F.2d 644, 645–46 (5th Cir.), *cert. denied,* 479 U.S. 882, 107 S.Ct. 269, 93 L.Ed.2d 246 (1986). Thus, appellant cannot claim that Modene Symm did not in fact have a legitimate privilege to assert merely because the answers he expected did not appear to be incriminating.

Further, appellant could not have limited the cross-examination questions that would have been posed by the State had Symm testified. A witness is subject to full cross-examination and cannot take the stand for a limited purpose. *See Felder v. State,* 848 S.W.2d 85, 99 (Tex.Crim.App.1992), *cert. denied,* 510 U.S. 829, 114 S.Ct. 95, 126 L.Ed.2d 62 (1993). Once a witness testifies concerning a transaction, he or she is subject to full cross-examination on the subject, and cannot terminate the questioning by asserting the privilege. *See Rogers v. United States,* 340 U.S. 367, 373, 71 S.Ct. 438, 442, 95 L.Ed. 344 (1951); *Draper v. State,* 596 S.W.2d 855, 857 (Tex.Crim.App. [Panel Op.] 1980).

The record strongly suggests that if Symm had testified, she would have been asked potentially incriminating questions. A parent's failure to provide care, protection, and medical care for her minor children can result in a prosecution for injury to a child by omission, and Symm had been charged with that offense. *See Ahearn v. State,* 588 S.W.2d 327, 329 (Tex.Crim.App. [Panel Op.] 1979); TEX. PENAL CODE ANN. § 22.04 (Vernon 1996). The evidence strongly indicated that Symm frequently left Troy in the exclusive care of appellant, and that she did so on the night of Troy's injury. Further, Symm's affidavit to the police stated:

Robert and his mother have been babysitting Troy ever since Troy was one month old. But, we had a previous agreement that Troy was to be watched at their home and not mine. Another reason that Robert was not to babysit Troy by himself was because the Department of Human Services had investigated a suspected abuse case involving my son Troy. This was back about 3 months ago when I just started working for Jim's Coffee Shop. Case workers found evidence of bruises on Troy's face consistent with what would come from a slap on the face. Also, they found trauma to Troy's penis.

I learned that case workers had found signs that would indicate Troy's penis had been pinched with some type of mechanical device such as a pair of pliers. The Department of Human Services who conducted an investigation were unable to come up

with sufficient evidence to have Robert Barcenas arrested or charged with a criminal offense and dropped the matter. Robert was the suspect in this particular case and Robert kept denying having any involvement regarding child abuse. No police officer or law enforcement official ever contacted me nor did I contact one. When this incident occurred Robert had been staying with me at my house on and off. But, when this child abuse case surfaced I had him leave my home. He begged me to have him stay at my home but I refused. I did however keep his mother as a babysitter for Troy and would allow Robert to come to my house and pick up Troy to take him to his mother's home. . . .

Symm also stated that she was unaware that appellant had "passed himself to the neighbors as my husband" and that on the night of Troy's injury she forgot to ask appellant why he was still at her home rather than at his mother's home.

Given her affidavit, Symm almost certainly would have been subjected to vigorous cross-examination about why appellant was allowed to care for Troy alone, despite the prior abuse investigation involving appellant; why Symm maintained that she did not live with appellant, despite the contrary testimony of neighbors and appellant; and why Symm did not seek medical attention for Troy, despite warnings that she should.

In light of the evidence and the circumstances, the trial court correctly determined that Symm reasonably asserted her privilege. The trial court did not abuse its discretion when it permitted her to do so. We therefore overrule appellant's fifth point of error.

### Expert Testimony

■ Appellant claims in his sixth point of error that the trial court erred in allowing EMS technician Thomas Winn to testify about Troy's medical condition without first establishing the experience or training that qualified Winn as an expert. Appellant first argues that Winn was permitted to testify that Troy had suffered severe head trauma. The testimony appellant complains of, however, was received without objection from appellant's trial counsel. Consequently, appellant's arguments were not preserved for appellate review. *See* TEX.R.APP. P. 52(a); TEX.R.CRIM. EVID. 103(a)(1).

Further, as outlined above, Drs. Klein, Bux, and Kellogg testified without objection to essentially the same facts as Winn. An alleged improper admission of evidence is rendered harmless when the same facts are admitted elsewhere without objection. *See Anderson v. State,* 717 S.W.2d 622, 627 (Tex. Crim.App.1986).

■ Appellant also complains of Winn's testimony concerning Troy's pulse. Winn testified that Troy's pulse was eighty-eight beats per minute and was very irregular. Over objection, Winn testified that a child of Troy's age should have a regular pulse between eighty and one hundred to be normal. As an experienced EMS technician with extensive classroom training and practical experience, Winn's specialized knowledge qualified him to give an expert opinion. *See* TEX.R.CRIM. EVID. 702. Additionally, numerous other witnesses described Troy as comatose or unconscious, or suffering from seizures. Consequently, the trial court did not abuse its discretion when it permitted Winn to testify as he did about Troy's medical condition. Appellant's sixth point is overruled.

### Hearsay Testimony

Appellant's seventh and eighth points claim the trial court erred in admitting hearsay testimony from Dr. Klein and Pamela Ruggiero. Klein testified over objection about the three explanations he was given concerning the possible cause of Troy's injuries: a fall; a television falling on Troy; and an automobile accident. Ruggiero testified about appellant's account about Troy falling down the steps. She testified without a hearsay objection about information regarding an earlier automobile accident involving Troy. As previously noted, several other witnesses referred to a fall or falls, a television falling on Troy, and an automobile accident.

■ Any statement made by appellant to Pamela Ruggiero was an admission of a party opponent, and thus was not hearsay. *See Cunningham v. State,* 846 S.W.2d 147, 151

(Tex.App.—Austin 1993), *affirmed,* 877 S.W.2d 310 (Tex.Crim.App.1994); *see also* Tex.R.Crim. Evid. 801(e)(2)(A). The testimony of both Ruggiero and Klein was cumulative of other similar testimony presented without objection. Any error in the admission of the testimony was therefore harmless. *See Anderson,* 717 S.W.2d at 626–27. Appellant's seventh and eighth points are overruled.

### Jury Argument

■ Appellant urges in his ninth point of error that the State made an improper "plea to the community" in final argument at the guilt-innocence phase of the trial. The State claims the prosecutor's arguments were proper pleas for law enforcement. After reviewing the record and the relevant law, we agree with the State.

The prosecuting attorney made the following remarks during her closing argument at the guilt-innocence phase of the trial:

PROSECUTOR: Take back the autopsy with you. Take back the photographs. Don't forget Troy. You know, you're here because you have been chosen by the community to make the decision, and that's it.
DEFENSE COUNSEL: Your Honor, I would urge the prosecutor not make a plea to the community. The jury is to consider—
THE COURT: The objection is overruled.
PROSECUTOR: Please don't forget Troy, that's all I'm asking. Don't forget him. Children need to be protected. Children need your protection. And when a mom has to work, and when a mom is forced to work long hours, like the day before when she had gotten off at 5 o'clock in the morning, and she leaves and she entrusts her child to a babysitter and her husband—and her boyfriend—whoever that person might be—don't send a message to the community that you're going to believe—
DEFENSE COUNSEL: Your Honor—

\* \* \* \* \* \*

DEFENSE COUNSEL:—the prosecutor knows that it's an improper argument to the community—

THE COURT: The objection is overruled. That's one of the purposes for the argument. . . .

\* \* \* \* \* \*

PROSECUTOR: It's not okay. It's not okay. Don't let it—don't let that message get out. . . .

Jury arguments are permissible so long as they are confined to four broad areas: (1) summations of the evidence; (2) reasonable deductions from the evidence; (3) answers to arguments of opposing counsel; and (4) pleas for law enforcement. *Dinkins v. State,* 894 S.W.2d 330, 357 (Tex.Crim.App.), *cert. denied,* —— U.S. ——, 116 S.Ct. 106, 133 L.Ed.2d 59 (1995). Generally jury arguments constitute reversible error only when they are extreme or manifestly improper, or inject new and harmful facts into evidence. *McKay v. State,* 707 S.W.2d 23, 36 (Tex. Crim.App.1985), *cert. denied,* 479 U.S. 871, 107 S.Ct. 239, 93 L.Ed.2d 164 (1986). In making this determination, the entire argument should be considered, not just isolated sentences. *See Drew v. State,* 743 S.W.2d 207, 220–22 (Tex.Crim.App.1987). Although a jury argument that the community expects, demands, or desires a particular result is improper, *see Cortez v. State,* 683 S.W.2d 419, 420 (Tex.Crim.App.1984), a prosecutor may address the jurors as representatives, spokesmen, and even the conscience of the community. *See Whittington v. State,* 580 S.W.2d 845, 847 (Tex.Crim.App. [Panel Op.] 1979); *Jones v. State,* 852 S.W.2d 710, 712–13 (Tex.App.—Corpus Christi 1993, no pet.); *Bigley v. State,* 831 S.W.2d 409, 414 (Tex. App.—Austin 1992), *aff'd,* 865 S.W.2d 26 (Tex.Crim.App.1993); *Bell v. State,* 774 S.W.2d 371, 375 (Tex.App.—Austin 1989, pet. ref'd), *cert. denied,* 497 U.S. 1008, 110 S.Ct. 3248, 111 L.Ed.2d 758 (1990). Measured against this standard, the prosecutor's argument that the jurors were chosen by the community conveyed much the same sentiment. After viewing these statements in the context of the State's entire jury argument, we conclude they were intended to stress the responsibility of the jurors to speak for the community, not a plea for conviction because of the community's desires or expectations.

Further, the prosecutor was within the bounds of proper argument when she referred to the message the verdict would send to the community. *See Goocher v. State*, 633 S.W.2d 860, 864–65 (Tex.Crim.App. [Panel Op.] 1982); *Garza v. State*, 783 S.W.2d 796, 800–01 (Tex.App.—San Antonio 1990, no pet.). In this case, the prosecutor never argued community demands or expectations, but made a plea for law enforcement. This was not improper, and thus, the trial court did not err when it overruled appellant's objection. We accordingly overrule appellant's ninth point of error, and affirm the judgment of the trial court.