COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-06-239-CR

 

DENISE ELVERIOUS MILLER                                                           APPELLANT

 

   V.

 

THE STATE OF TEXAS                                                                 STATE

 

                                              ------------

 

             FROM THE 16TH DISTRICT COURT OF DENTON COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------      

I. 
Introduction








Denise
Elverious Miller appeals a jury verdict finding her guilty of murder.  The trial court sentenced her to sixty-two
years=
confinement.  In three points, Miller
contends that the trial court erred by denying her motion to suppress, by
admitting testimony of four witnesses, and by failing to include certain
definitions and instructions on lesser included offenses in the jury
charge.  We will affirm.

II.  Factual
Background

In
December 2004, Miller lived at 2604 Elk Horn in Little Elm, Texas (the AElk Horn
home@).  Miller shared the Elk Horn home with her two
high-school -aged children and Little Elm police officer Jonathan Wayne
Irby.  When Officer Irby failed to report
for his 6:00 a.m. shift and failed to call in on December 10, his fellow
officers became worried because it was unusual for Officer Irby to miss work
and unusual for him to not call in. 
Little Elm police officers James Wynn and Jerry Walker attempted to
contact Officer Irby on his cell phone on numerous occasions that morning but
to no avail.  After failing to reach
Officer Irby on his cell phone, Officer WalkerCwho
worked for the Little Elm Police Department as a school resource officer at the
Little Elm High SchoolCspoke with Miller=s
daughter, W.M., and son, W.M., Jr. at the high school.  W.M. and W.M., Jr. gave Officer Walker a pass
code to the Elk Horn home garage, and Officer Walker relayed that pass code to
Officer Wynn and Officer Cruljack.  








Officer
Wynn arrived at the Elk Horn home around 9:30 a.m.  He saw Officer Irby=s squad
car across the street from the house, but he could not see or hear anything
inside the house.  Officer Wynn used the
pass code that Officer Walker had received from W.M. and W.M., Jr. to enter the
Elk Horn home garage.  Once inside the
Elk Horn home, Officer Wynn did not find anyone but did discover Officer Irby=s
prescription sunglasses, which Officer Irby customarily had with him.  After completing the welfare check at the Elk
Horn home, Officer Wynn continued answering calls and doing routine patrol
work. 








But later
that day, Officer Wynn traveled to 432 Willow Lake in Little Elm, Texas (the AWillow
Lake home@), to see if Officer Irby was
there.  Officer Irby had leased the
Willow Lake home in October after experiencing problems in his relationship
with Miller, and he had reportedly moved in, out, and back into the Willow Lake
home in November and December 2004.  At
the request of Officer Wynn, Francis GabrielCthe part
owner and property manager of the Willow Lake homeCbrought
the keys and gave officers permission to enter the Willow Lake home.  Officers Wynn and Walker entered the home and
saw Officer Irby=s cell phone, fanny pack, and a
piece of paper that had something written on it lying on the kitchen counter
top.  Seeing Officer Irby=s cell
phone and fanny pack led them to believe that Officer Irby was in the house
because he kept those items with him at all times.  Officer Wynn continued through the Willow
Lake home and soon observed Officer Irby=s
lifeless body lying face down between a bedroom and the hallway.  Officer Wynn was unable to detect Officer
Irby=s pulse
and saw a gunshot wound to the back of Officer Irby=s head. 

After
investigating the crime scene and determining that Miller was a suspect, Texas
Ranger Tracy Murphree prepared an affidavit for a search warrant of the Elk
Horn home.  After securing and executing
the search warrant, Texas Ranger Murphree did not find Miller at the Elk Horn
home, but he did seize a journal, handgun ammunition, a handwritten note from
Miller to her children, a credit card statement, and some bank and credit card
receipts.         On the very next day, Vicki SandbergCthe
general manager of Ramada Limited in Gainesville, TexasCreceived
a phone call from the front desk informing her that someone had fallen in one
of the rooms and had called the front desk seeking help in getting up.  After arriving at the room, Sandberg discovered
that the door was locked and called the maintenance man to let her in.  When she opened the door, Sandberg saw Miller
lying on the floor, noticed bloody linens on the floor, noticed a piece of
paper with a gun on top of it on the desk, and heard Miller say that she had
fallen and hit her head on something.  








When
Gainesville police officers arrived with an ambulance shortly thereafter,
Gainesville Police Department Officer Tom Reynolds noticed blood around Miller=s lips,
saw that her eye was swollen shut and appeared to be bulging out, and noticed a
small wound by Miller=s right temple.  Medical personnel later diagnosed the small
wound by her right temple as a self-inflicted gunshot wound.  Officer Reynolds and Officer Mike Morris, a
criminal investigator with the Gainesville Police Department, found a
handwritten note in which Miller confessed to killing Officer Irby, two
handguns, empty liquor bottles, and sleeping pills in Miller=s Ramada
room.  

The
State charged, and the grand jury indicted, Miller for intentionally or
knowingly causing the death of Officer Irby by shooting him with a
firearm.  Miller filed a motion to
suppress the fruits of the initial search of the Elk Horn home, claiming that
police did not have probable cause or other justification for searching the Elk
Horn home.  The trial court denied Miller=s
motion, a jury subsequently found Miller guilty of murder, and the jury
assessed her punishment at sixty-two years=
confinement.  Miller timely filed her
notice of appeal, and this appeal ensued.

III.  Motion to Suppress 








In her
first point, Miller contends that the trial court erred by denying her motion
to suppress written statements discovered by police officers after entering her
home without a warrant.  Assuming without
deciding that the trial court did err by denying Miller=s
motion, however, we conclude that Miller was not harmed.  See, e.g., Ibarra v. State, 11 S.W.3d
189, 194 (Tex. Crim. App. 1999) (assuming error in denial of motion to suppress
but nevertheless finding admission of evidence harmless), cert. denied,
531 U.S. 828 (2000). 

Having
assumed error, we must conduct a harm analysis to determine whether the error
calls for reversal of the judgment.  Tex. R. App. P. 44.2.  If the error is constitutional, we apply rule
44.2(a) and reverse unless we determine beyond a reasonable doubt that the
error did not contribute to Miller=s
conviction or punishment.  Tex. R. App. P. 44.2(a).  Otherwise, we apply rule 44.2(b) and disregard
the error if it did not affect Miller=s
substantial rights.  Tex. R. App. P. 44.2(b); see Mosley
v. State, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh=g), cert.
denied, 526 U.S. 1070 (1999); Coggeshall v. State, 961 S.W.2d 639,
642-43 (Tex. App.CFort Worth 1998, pet. ref=d). 








The harm
analysis for a trial court=s
erroneous denial of a motion to suppress and subsequent admission of evidence
obtained in violation of the Fourth Amendment is rule 44.2(a)=s
constitutional standard.  See
Hernandez v. State, 60 S.W.3d 106, 108 (Tex. Crim. App. 2001); McQuarters
v. State, 58 S.W.3d 250, 258 (Tex. App.CFort
Worth 2001, pet. ref=d).  The question under that standard is whether
the trial court=s denial of a motion to suppress
and subsequent admission of evidence was harmless beyond a reasonable
doubt.  See Williams v. State, 958
S.W.2d 186, 194 (Tex. Crim. App. 1997). 
In applying the Aharmless error@ test,
our primary question is whether there is a Areasonable
possibility@ that the error might have
contributed to the conviction.  Mosley,
983 S.W.2d at 259.

Our
harmless error analysis should not focus on the propriety of the outcome of the
trial; instead, we should calculate as much as possible the probable impact on
the jury in light of the existence of other evidence.  Wesbrook v. State, 29 S.W.3d 103, 119 (Tex.
Crim. App. 2000), cert. denied, 532 U.S. 944 (2001).  We consider the source and nature of the
error, the extent that it was emphasized by the State, its probable collateral
implications, the weight a juror would probably place on the error, and whether
declaring it harmless would be likely to encourage the State to repeat it with
impunity.  Harris v. State, 790
S.W.2d 568, 587 (Tex. Crim. App. 1989). 
This requires us to evaluate the entire record in a neutral, impartial,
and even-handed manner, not Ain the
light most favorable to the prosecution.@  Id. at 586. 

At
trial, Miller sought exclusion of the handwritten note that Little Elm police
officers discovered during their initial search of the Elk Horn home.  In that note, Miller wrote,

I apologize for
everything, every decision that I made, whether good or bad.  I thought that my decisions were good for
all, but they weren=t.  I got tired of hurting and allowing others to
hurt me.  Please forgive me and continue
to pray for my soul.

 








Nothing
in that note definitively implicates Miller in Officer Irby=s
murder.  If anything, this note
demonstrates that Miller was remorseful for past decisions.  The State did not emphasize this note, and
the probable collateral implications of admitting this note were minimal, at
best, considering that the jury also heard the contents of two other
handwritten notes, neither of which Miller objected to at trial or contests the
admissibility of in this appeal.

One of
those other notes was discovered at the Willow Lake home at the same time that
Officers Wynn and Walker discovered Officer Irby=s dead
body.  In that note, Miller wrote, AI did
it.  I took our lives.  Call our moms. [Phone number], Denise.  Wayne, [phone number].@  The other note was discovered at the
Gainesville Ramada Limited where police found Miller alive with a
self-inflicted gunshot wound to the head. 
That note was the longest and most detailed of the three.  A portion of that note read,

I=m here because I killed
my boyfriend this afternoon.  His name is
J. Wayne Irby.  He is a Little Elm police
officer . . . . You can find his body at 432 Willow Lake Drive in Little Elm,
Texas.  He is scheduled to be at work at
six a.m. on Friday morning.

 

. . . . 

 

I=m sorry about everything
that I have done and lives that I have affected.  I accidentally shot him and then freaked out
and ran.  The only solution that I knew
what to do was to kill myself also . . . .

 








He=s in the hallway and
partially in the second bedroom.  I know
I=m going to hell and I can=t fix anything now.  I=m so sorry. 
I apologize to my family and more so to his.  I did a horrible thing.

 

The jury
had the opportunity to examine all three notes and to hear the notes read to
them out loud.  While the note obtained
from the initial search of the Elk Horn home may have, arguably, given the jury
an example of Miller=s remorse for some unspecified
past decision, it did not expressly implicate Miller in Officer Irby=s murder
like the other two notes did, and the jury nevertheless had the opportunity to
see and hear any remorse exhibited by Miller in both of the other two
notes.  When considering the probable
impact of this first disputed note in light of the other evidence, we cannot
say that there is a reasonable probability that this first note would have
contributed to Miller=s conviction. 

After
carefully reviewing the record and performing the required harm analysis under
rule 44.2(a), we hold beyond a reasonable doubt that the trial court=s error
did not contribute to Miller=s
conviction or punishment.  See  Tex.
R. App. P. 44.2(a).  We overrule
Miller=s first
point.

IV.  Testimony of Four Witnesses

In her
second point, Miller contends that the trial court reversibly erred by
admitting into evidence the testimony of four witnesses who each referenced
hearsay statements made by the deceased victim, thereby depriving her of her
rights of confrontation and cross-examination. 








A.  Nontestimonial Statements

We will
uphold a trial court=s evidentiary ruling if it is
reasonably supported by the record and is correct under any theory of
applicable law.  Martin v. State,
173 S.W.3d 463, 467 (Tex. Crim. App. 2005); see Cantu v.

State, 842
S.W.2d 667, 682 (Tex. Crim. App. 1992), cert. denied, 509 U.S. 926
(1993).  In deciding whether the
admission of these statements violated appellant=s right
to confrontation, we review the trial court=s ruling
de novo. Wall v. State, 184 S.W.3d 730, 742‑43 (Tex. Crim. App.
2006).








The
accused in a criminal prosecution has the right to be confronted with the
witnesses against her.  See U.S. Const. amend. VI.  A trial court violates an accused=s Sixth
Amendment rights by admitting a hearsay statement made by a nontestifying
declarant if the statement was testimonial and the accused lacked a prior
opportunity for cross-examination.  See
Crawford v. Washington, 541 U.S. 36, 68, 124 S. Ct. 1354, 1374 (2004); Wall,
184 S.W.3d at 734.  A testimonial
statement is therefore inadmissible unless it is shown that the declarant is
presently unavailable and the accused had a prior opportunity for
cross-examination.  See Wall, 184
S.W.3d at 734-35.  A testimonial
statement is inadmissible even though it may fall within a Afirmly
rooted hearsay exception or bears particularized guarantees of trustworthiness.@  Id. 
While courts across the state and nation continue to struggle with
determining what a Atestimonial@
statement is, the statements that Miller complains of in the instant case do
not fall within any court=s definition of Atestimonial.@

The
Supreme Court is clear that the term Atestimonial@ covers
(1) ex parte in-court testimony or its functional equivalent, (2) extrajudicial
statements contained in formalized testimonial materials such as prior
testimony at a preliminary hearing, before a grand jury, or at a former trial,
and (3) police interrogations.  See
Crawford, 541 U.S. at 52, 124 S. Ct. at 1364; Martinez v. State, No.
02-06-00088-CR, 2007 WL 2067852, at *7 (Tex. App.CFort
Worth July 19, 2007, no pet. h.).  In
determining the testimonial character of a statement, we contemplate the
declarant=s ability to appreciate the
legal ramifications of his statement.  Wall,
184 S.W.3d at 742. 








Miller
contends that testimony of Officer Wynn; Officer Walker; Officer Irby=s
landlord, Francis Gabriel; and Cynthia Medrano regarding Miller and Officer
Irby=s
relationship all violated Miller=s Sixth
Amendment rights because they were based on statements that Officer Irby
previously had made to them.  Officer
Wynn testified that Officer Irby had told him that his and Miller=s
relationship Awasn=t going
too good and that he was - - he was thinking about moving back out.@  Officer Walker testified that Officer Irby
had previously told him that the relationship with Miller Awas not
working.@  Gabriel testified that Officer Irby had told
him that he was leasing the Willow Lake home because Ahe was
separating@ from his Apartner.@  Medrano testified that Officer Irby had told
her that his relationship with Miller Awas not
working@ and
that he was Aplanning on moving.@  

The
record does not reflect that these statements were the functional equivalents
of ex parte in-court testimony, were extrajudicial statements contained in
formalized testimonial material, or were made in response to police
interrogation.  Nor does the record
reflect that Officer IrbyCthe declarantChad the
ability to contemplate the legal ramifications of his statements.  Some of the statements were made at least a
month before the shooting, and all of the statements were made to Officer Irby=s
friends at a time when no reasonable person in Officer Irby=s
position would have contemplated that the statements would be used in later
legal proceedings.  We therefore hold
that Miller=s Sixth Amendment rights were
not violated because Officer Irby=s
statements to the four witnesses were nontestimonial statements.  See, e.g., King v. State, 189 S.W.3d
347, 359 (Tex. App.CFort Worth 2006, no pet.)
(holding that statements made to friends in course of conversations about how
murder victim died and about disposing of murder victim=s body
were nontestimonial).  

B.  Harmless Error in Admitting Hearsay
Statements








Although
we hold that the statements were nontestimonial and that the admission of the
four witnesses= testimonies did not therefore
violate Miller=s Sixth Amendment rights, we
must nevertheless address whether the hearsay statements were otherwise
inadmissible within the rules of evidence. 
See id. at 359-60. 
Assuming without deciding that the four witnesses=
statements regarding the relationship between Miller and Officer Irby were
inadmissible hearsay statements and that the trial court erred by admitting
them, we must conduct a harm analysis to determine whether the error calls for
reversal of the judgment.  Tex. R. App. P. 44.2.

If the
error is constitutional, we apply rule 44.2(a) and reverse unless we determine
beyond a reasonable doubt that the error did not contribute to Miller=s
conviction or punishment.  Tex. R. App. P. 44.2(a).  Otherwise, we apply rule 44.2(b) and
disregard the error if it did not affect Miller=s
substantial rights.  Tex. R. App. P. 44.2(b); see Mosley,
983 S.W.2d at 259; Coggeshall v.  961 S.W.2d at 642-43.  The admission of inadmissible hearsay is not
constitutional error.[2]  See Lopez v. State, 200 S.W.3d 246,
255 (Tex. App.CHouston [14th Dist.] 2006, pet.
ref=d).








Because
we determine that the assumed error is not constitutional, rule 44.2(b) is
applicable.  Tex. R. App. P. 44.2(b). 
A substantial right is affected when the error had a substantial and
injurious effect or influence in determining the jury=s
verdict.  King v. State, 953
S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing Kotteakos v. United States,
328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)); Coggeshall, 961 S.W.2d
at 643.  In making this determination, we
review the record as a whole.  See
Johnson v. State, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). 

As we
previously indicated, the four witnesses=
statements at issue here all related to the relationship between Miller and
Officer Irby.  Miller does not indicate
how the admission of these statements affected her substantial rights.  At trial, the jury heard evidence that
Officer Irby died from a gunshot wound to the back of the head, that no one had
heard from Officer Irby or Miller since the night before Officer Irby=s death,
that police found two handguns in the hotel room where Miller was found with a
gunshot wound to her head, and that Miller confessed to shooting Officer Irby
in multiple handwritten notes and claimed it was an accident.[3]  








We
conclude that, in the context of the entire case against Miller, any error
committed by the trial court in admitting the testimony in question did not
have a substantial or injurious effect on the jury=s
verdict and did not affect Miller=s
substantial rights.  See King, 953
S.W.2d at 271.  Thus, we disregard the
error and overrule Miller=s second point.  See Tex.
R. App. P. 44.2(b).

V.  Jury Charge

In her
third point, Miller contends that the trial court erred by failing to include
in the jury charge (1) the lesser included offenses of criminally negligent
homicide and manslaughter and (2) legal definitions of Avoluntary
conduct@ and Aintentional,
knowing [,] and reckless.@ 


A.     Proper Jury Charge

Miller
contends that the trial court erred by failing to include the lesser included
offenses of criminally negligent homicide and manslaughter in the jury
charge.  Miller specifically argues that
because one of her notes indicated that the shooting was Aaccidental,@ and
because the medical examiner testified that he could not rule out the
possibility that negligence caused Officer Irby=s death,
she was entitled to a jury charge including the lesser included offenses of
manslaughter and criminally negligent homicide. 








We use a
two-step analysis to determine whether an appellant was entitled to a lesser
included offense instruction.  Hall v.
State, 225 S.W.3d 524, 528 (Tex. Crim. App. 2007); Rousseau v. State,
855 S.W.2d 666, 672-73 (Tex. Crim. App.), cert. denied, 510 U.S. 919
(1993).  First, the lesser offense must
come within article 37.09 of the code of criminal procedure.  Tex.
Code Crim. Proc. Ann. art. 37.09 (Vernon 1981); Moore v. State,
969 S.W.2d 4, 8 (Tex. Crim. App. 1998).  AAn
offense is a lesser included offense if . . . it differs from the offense
charged only in the respect that a less culpable mental state suffices to
establish its commission.@ 
Tex. Code Crim. Proc. Ann.
art. 37.09(3).

Second,
some evidence must exist in the record that would permit a jury to rationally
find that if the appellant is guilty, she is guilty only of the lesser
offense.  Hall, 225 S.W.3d at 536;
Salinas v. State, 163 S.W.3d 734, 741 (Tex. Crim. App. 2005); Rousseau,
855 S.W.2d at 672-73.  The evidence must
be evaluated in the context of the entire record.  Moore, 969 S.W.2d at 8.  Isolated facts taken out of context from the
record will not justify a lesser included offense instruction. Barcenas v.
State, 940 S.W.2d 739, 745 (Tex. App.CSan
Antonio 1997, pet. ref=d).  There must be some evidence from which a
rational jury could acquit the appellant of the greater offense while
convicting her of the lesser included offense. 
Moore, 969 S.W.2d at 8. 
The court may not consider whether the evidence is credible, controverted,
or in conflict with other evidence.  Id.  Anything more than a scintilla of evidence
may be sufficient to entitle a defendant to a lesser charge.  Hall, 225 S.W.3d at 536. 








The
State concedes that Appellant satisfied the first step with respect to both
manslaughter and criminally negligent homicide because both of those offenses
simply require a less culpable mental state than that required for murder.  Under the second step, we must determine whether
there is some evidence in the record that would permit a jury to rationally
find that if Miller is guilty, she is guilty only of the lesser offense.  See id.

The
offenses of manslaughter and criminally negligent homicide require evidence of
a substantial and unjustifiable risk that the result will occur, and that the
accused=s
failure to perceive or conscious disregard of that risk is a gross deviation
from the standard of care that an ordinary person would exercise under all the
circumstances as viewed from the actor's standpoint.  Barcenas, 940 S.W.2d at 746.  

To
support her claim that the jury should have been charged on these lesser
included offenses, Miller relies on two points. 
First, Miller points to evidence in the record that her handwritten note
found at the RamadaCthe longest and most detailed of
the three notesCstated, AI
accidentally shot him.@ 
Second, Miller points to the medical examiner=s
testimony that he could not rule out negligence as a cause of death.  








This
evidence is not proof that Miller was aware of, but ignored, a substantial and
unjustifiable risk that death would result from her actions.  See id.  Neither is it proof that Miller failed to
perceive or consciously disregarded a substantial and unjustifiable risk that
death would result from her actions.  See
id.  The record does not provide
evidence from which a rational jury could acquit Miller of murder while
convicting her of manslaughter or criminally negligent homicide.  See Moore, 969 S.W.2d at 8.  We therefore hold that the record does
not contain evidence that would permit a jury rationally to find that if Miller
was guilty, she was guilty only of manslaughter or criminally negligent
homicide.[4]  See Barcenas, 940 S.W.2d at 746.  We overrule Miller=s third
point.

VI.  Conclusion

Having
overruled Miller=s three points, we affirm the
trial court=s judgment.     

 

                        SUE WALKER

                        JUSTICE

 

 

PANEL F: LIVINGSTON,
DAUPHINOT, and WALKER, JJ.

 

DO NOT PUBLISH

Tex.
R. App. P.
47.2(b)

 








DELIVERED: September 13,
2007











[1]See Tex. R. App. P. 47.4.





[2]Because we previously
held that the admission of these statements did not violate Miller=s Sixth Amendment rights,
we likewise hold that any error in admitting the statements is
nonconstitutional.





[3]We note that the
statements that Miller complains aboutCstatements indicating that Miller and Officer
Irby had been experiencing problems in their relationshipCdovetail with her theory
that the shooting was accidental.





[4]Although Miller also
contends that the trial court erred by not including definitions of Avoluntary conduct@ and Arecklessness,@ the terms Avoluntary conduct@ and Arecklessness,@ or any forms thereof, do
not appear in the trial court=s charge to the jury.  Because the charge did not include those terms,
the trial court did not err by not including definitions of those terms in the
charge.  See, e.g., Lapp v. State,
519 S.W.2d 443, 446 (Tex. Crim. App. 1975) (holding that definition of terms
was not necessary where jury charge did not mention terms).