# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-01-00524-CR

**Daniel B. Gonzales a/k/a Danny Gonzales, Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE DISTRICT COURT OF CALDWELL COUNTY, 274TH JUDICIAL DISTRICT NO. 2000-170, HONORABLE FRED SHANNON, JUDGE PRESIDING

A jury found appellant Daniel B. Gonzales guilty of the offense of capital murder of a six-month-old girl. *See* Tex. Pen. Code Ann. ' 19.03(a)(8) (West 1994). The State did not seek the death penalty, and the district court sentenced appellant to life in prison. *See* Tex. Pen. Code Ann. ' 12.31 (West 1994); Tex. Code Crim. Proc. Ann. art. 37.071, ' 1 (West Supp. 2002). Appellant contends that the evidence was legally insufficient to prove he intentionally or knowingly caused the baby=s death. Appellant also raises two evidentiary issues contending that the district court erred by admitting (1) testimony from an expert regarding appellant=s intent and (2) testimony from a police officer regarding appellant=s angry reaction during a police interrogation. We will affirm the conviction.

## Background

Appellant, the deceased baby, and the baby=s mother, Monica Torres, lived together. On May 19, 2000, J.V., Monica=s ten-year-old sister, also spent the night. Everyone slept in the living room

near the window air-conditioner. J.V. slept on the couch, appellant and Monica slept on a mattress on the hardwood floor, and the baby slept on an upholstered swivel chair next to the mattress on the floor. The seat of the swivel chair was about eighteen inches off the floor. When J.V. awoke the next morning, she gave the baby a bottle. The baby was happy and in good spirits. Later that morning, Monica and J.V. decided to walk to the grocery store to buy food for a barbecue. Just before they left for the store, J.V. and Monica checked the baby and she was asleep in the swivel chair and breathing normally. While they were at the store, appellant was the only person at home with the baby. Monica and J.V. returned from the store after about twenty minutes. When they returned, appellant was outside preparing the barbecue grill.

Appellant asked Monica to help him move the mattress from the floor in the living room to his bedroom. A few minutes after they moved the mattress, appellant told Monica, Athe baby has fallen with me.@ According to Monica, appellant told her that he changed the baby=s diaper, left the baby in the swivel chair, went outside, and then heard a loud thump inside the house. Inside he found the baby lying on her back on the floor. He picked up the baby and put her back in the chair. When Monica saw the baby, she picked her up and knew immediately something was wrong because her body was very limp, her eyes were closed, and her lips were turning purple. At some point appellant moved the baby into its crib. The baby was making whimpering and groaning noises and was unresponsive. Monica put the baby in a baby bathtub and tried to get her to respond to the water but she did not. When Monica took the baby out of the tub, she felt the back of the baby=s head and it was Ajust mush.@ Monica told appellant that she wanted to call 911, but appellant told her that if she did, and the baby was okay, the authorities would take the baby away

2

from her.  Monica, however, went next door and called for help.  The ambulance came and took the baby to Brackenridge Hospital where she later died.

Several medical experts testified about the baby=s injuries and the cause of death.  Dr. Nancy Kellogg, a licensed physician, a professor of pediatrics, and a recognized national and international expert in child abuse, reviewed the police reports and the medical records and concluded that the baby died from severe head injuries, including multiple skull fractures, brain hemorrhaging and brain swelling.  The baby=s skull was shattered into pieces.  Additionally, she noted that internal injuries were present as well, including bruises to the diaphragm, pancreas, and intestines.  She concluded that the point of impact was the left rear area of the baby=s head and that a tremendous amount of force had been used during the incident.  Additionally, she concluded that the baby had suffered at least two extremely violent, significant impact forces, at least one to the head and one to the stomach.  She testified, that the force used was Alike a train hit this kid, tremendously violent.@  She concluded that the amount of force used was in excess of fifty G forces, and probably much greater.  There were no dents or open wounds found on the skull to indicate a penetrating object, and therefore the injuries instead indicated the baby=s head made a violent impact with some hard, flat surface.  Dr. Kellogg concluded that the baby=s injuries could not have occurred from a fall from a chair, and that the injuries were so severe, the baby was dying from the moment of impact.  Dr. Kellogg concluded that the baby=s death was not accidental, was not the result of a prior fall, an old brain injury, shaking or the result of spinning the child in a chair.

Dr. Renee Jankowski, the treating physician at the hospital, testified that the baby was almost dead upon arrival at the hospital.  She concluded that the baby had suffered an extensive massive

3

skull fracture, with massive bleeding in many parts of her brain, and severe injuries to the eyes to the extent that the retinas were detached and falling off the back of her eyes. The cause of death was massive head trauma. She testified that the degree of force used against the baby was so great that the actor Ahad to know that they could kill the baby.@ She said that the symptoms exhibited by the baby immediately after the trauma would have been obvious to any observer. She concluded that it would have been impossible for a baby injured to this extent to have suffered such injuries from flipping out of a chair. She concluded upon hypothetical facts that a reasonable person who changed the diaper of a baby injured to this extent would have immediately recognized that something was dramatically wrong with the baby.

Dr. Patricia Aronin, a licensed physician and specialist in pediatric neurosurgery, reviewed the medical records and the baby=s autopsy report. She concluded that the injuries were not accidental. She also concluded that the injuries were caused by the baby=s head coming in contact with a hard flat surface. Further, after the baby suffered these injuries, there was no way the baby would have looked normal. The baby=s symptoms would have been obvious immediately.

Dr. Elizabeth Peacock, the medical examiner for Travis County, performed the autopsy and reviewed the police reports. She concluded that the point of impact was the left side of the back of the baby=s head. She concluded that the baby=s injuries were not the result of shaking, old head injuries, or falling off a couch. She characterized the cause of death as a non-accidental homicide. The injuries were consistent with grabbing a child and doing a full, over-the-head body slam to a hard surface. She concluded that the injuries to the head and chest occurred at approximately the same time and that the baby received at least two violent blows. She stated, Aanyone causing the injury or anyone witnessing this injury would have

4

immediately been aware that this was a child who was likely to be severely injured.@ Further she stated that she believed, Ait would be instinctual to see this kind of injury occur and not B B understand that there was a great possibility of death.@ Upon impact she said certain symptoms would be immediately noticeable to the untrained observer including unconsciousness, a lack of response to stimuli, glazed eyes, no audible sound except possibly a mewing sound, and a floppy head and arms.

Appellant testified that he was alone with the baby for about twenty minutes while Monica and her sister were at the store. Appellant agreed that the baby was fine when Monica and her sister left for the store. While Monica and her sister were at the store, appellant changed the baby=s diaper. She was fussy, appellant rubbed her back, and patted her, and she went back to sleep in the swivel chair. Appellant went back outside to tend to the barbecue. About two to five minutes later, he heard a loud noise and heard the baby yell or cry out. Appellant went inside and saw the baby lying face up on the floor. He noticed that the baby was not acting normally, that something was dramatically wrong with her, and that she was breathing funny. He also noticed some swelling on her head and that her head hung down. When he tickled her feet she did not respond, and he was scared. Appellant picked her up and put her back in the chair. When Monica and Jessica returned from the store, appellant told Monica something was wrong with the baby. They tried the bath and the baby did not respond. According to appellant, J.V. wanted to go for help and Monica told her Ano.@ Appellant said that he also told Monica they needed to get help for the baby but she told him Ano, they will take my baby away.@ Appellant denied that he attempted to dissuade Monica from calling 911. Appellant kept telling Monica that they needed to get help for the baby but she insisted that they not get help. Eventually, according to appellant, Monica went next door to phone 911.

5

Appellant denied ever hitting the child. According to appellant, Monica was responsible for the baby=s death.

Other evidence related to the incident included testimony from Cheryl Walton, a paramedic who responded to the 911 call. Appellant told Walton that the baby had fallen off the couch and that babies always fall off the couch. Walton described appellant as very nervous and said that, while they were talking, appellant would not look at her directly. Walton described Monica as very emotional, upset, and crying. Walton tried to talk with Monica but due to her emotional state, she was unable to have a conversation with her. Walton believed that the baby=s injuries were grossly inconsistent with appellant=s explanation for the injuries. Walton believed that appellant was Acovering up@ something.

Lieutenant John Roescher, with the Lockhart Police Department, testified that he spoke with appellant at the scene and at the hospital on the day of the incident. Lieutenant Roescher described appellant=s demeanor as very matter-of-fact; that is, he was not angry, crying or emotional in any way.

Monica testified that after the baby died, appellant told her to not talk with police about the incident. After appellant was arrested and while he was in jail awaiting trial, he told her, Aif he went down, that he would kill somebody. He would, in this courtroom, make sure that he killed somebody, because he wasn=t going down for nothing, that he didn=t do it. And he would make sure that he would go down for something.@ Monica testified that he told her he did not want her talking with anyone. Monica also testified that appellant told her he wanted to leave town and he wanted her to go with him. Monica testified that appellant previously had bitten her after he locked her out of the house and she attempted to crawl in

6

through a window, hit her on the head, and had pushed her down causing her to break a finger. Monica testified that appellant was jealous of the baby and the time she spent caring for the baby.

J.V. testified that about two weeks before the incident, appellant had twice placed the baby in the swivel chair and spun the chair forcefully. Appellant then picked up the baby and commented about the baby=s eyes and how scared she looked.

**Discussion**

Appellant raises three issues. First, he argues that the evidence is legally insufficient to sustain the conviction. Second, appellant contends that the district court erred by allowing Dr. Peacock to testify about her opinion regarding appellant=s intent. Finally, appellant contends that the district court erred by allowing Lieutenant Roescher to testify about appellant=s disposition and reaction during a police interrogation.

*Sufficiency of the evidence*

Appellant contends that the district court erred in overruling his motion for instructed verdict because the evidence presented was legally insufficient to support the conviction. We review the denial of a motion for instructed verdict by the same standard used for reviewing a challenge to the legal sufficiency of the evidence. *Cook v. State*, 858 S.W.2d 467, 470 (Tex. Crim. App. 1993); *Youens v. State*, 988 S.W.2d 404, 407 (Tex. App.CHouston [1st Dist.] 1999, no pet.). When reviewing the legal sufficiency of the evidence, we view the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.

7

*Jackson v. Virginia*, 443 U.S. 307 (1979); *King v. State*, 29 S.W.3d 556, 562-565 (Tex. Crim. App. 2000); *Roberson v. State*, 16 S.W.3d 156, 164-172 (Tex. App.CAustin 2000, pet. ref=d). The jury is the exclusive judge of the credibility of the witnesses and the weight to be given to the testimony. *Roberson*, 16 S.W.3d at 164. Conflicts in testimony do not destroy the legal sufficiency of the evidence, but relate only to the weight and credibility assigned to the evidence by the jury. *Id.* The reviewing court must therefore refrain from reconciling these conflicts in an attempt to substitute its judgment for that of the jury.

A person commits capital murder if he intentionally or knowingly causes the death of an individual under six years of age. *See* Tex. Pen. Code Ann.'' 19.01(b), 19.03(a)(8) (West 1994). To be legally sufficient, the evidence must be sufficient for any rational juror to conclude that appellant acted intentionally, when it was his conscious objective or desire to cause the death of the baby, or in the alternative, knowingly, when he was aware that his conduct was reasonably certain to cause the death of the baby. *See Lugo-Lugo v. State*, 650 S.W.2d 72, 80 (Tex. Crim. App. 1983). Intent to kill can be established by direct or circumstantial evidence, and can be inferred from the acts, words, and conduct of the accused. Further, intent can be inferred from the extent of the injuries to the victim, the method used to produce the injuries, and the relative size and strength of the parties. *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995). In a murder case, evidence of a particularly brutal or ferocious mechanism of death, inflicted upon a helpless victim, can be controlling upon the issue of intent or knowledge. *Id. See also Brown v. State*, 508 S.W.2d 91, 96 (Tex. Crim. App. 1974). When an individual violently exerts great force to strike the head or trunk of an infant victim, reason and common sense indicate the conduct clearly manifests the actor=s intent to cause death due to the frailty of the victim and the power of the force.

8

*Encina v. State*, 471 S.W.2d 384, 386-87 (Tex. Crim. App. 1971); *Barcenes v. State*, 940 S.W.2d 739, 744-45 (Tex. App.CSan Antonio 1997, pet. ref=d).

Proof of intent is most often established by circumstantial evidence because the intent of the accused is Aconcealed within his own mind and can only be determined from his words, acts, and conduct.@ *Smith v. State*, 965 S.W.2d 509, 518 (Tex. Crim. App. 1998). Therefore, circumstantial evidence indicating a consciousness of guilt, such as evidence of flight or attempts by the accused to fabricate or suppress evidence, is particularly persuasive proof regarding the intent of the accused. *Burks v. State*, 876 S.W.2d 877, 903 (Tex. Crim. App. 1994); *Torres v. State*, 794 S.W.2d 596, 598, 599 (Tex. App.CAustin 1990, no pet.). Post-incident statements by the accused about how a child was injured can indicate a consciousness of guilt, especially when the statements are grossly inconsistent with the medical findings. *Brown v. State*, 508 S.W.2d 91, 96 (Tex. Crim. App. 1974); *Barcenes*, 940 S.W.2d at 744-45.

In reviewing the evidence in a light most favorable to the prosecution, the record shows that Monica and her sister left the baby with appellant and went to the store. When they left, the baby was uninjured. Appellant had exclusive access to the baby for twenty minutes while the two were at the store. When Monica and her sister returned, they found the baby severely injured. Appellant was the only person capable of inflicting the injuries during that time. The medical evidence showed that a blunt force trauma in excess of fifty G forces fractured the baby=s skull into separate pieces, immediately resulting in massive head and brain injuries which caused the baby=s death. The mechanism and extent of the injuries shown by the evidence was particularly ferocious. Further, significant circumstantial evidence regarding appellant=s intent

admitted at trial included post-incident evidence from which any rational juror could infer appellant=s consciousness of guilt. Appellant tried to persuade Monica not to call the ambulance, he moved the mattress from the immediate scene before police officers arrived to make more plausible his explanation that the baby fell off the chair onto the hardwood floor, he acted very nervous at the scene, he gave an explanation for the injuries which was grossly inconsistent with the medical evidence, he made threatening statements to Monica in an attempt to keep her from talking to anyone about the incident, he threatened to leave town because of the incident, he was jealous of the time Monica spent caring for the baby, and he dealt with the baby in a rough fashion only a few days before the incident. Viewing the evidence in the light most favorable to the verdict, we hold that the evidence was sufficient for any rational juror to conclude beyond a reasonable doubt that appellant intentionally and knowingly killed the baby. The district court did not err in overruling appellant=s motion for instructed verdict. We overrule appellant=s first issue.

### Expert=s testimony regarding appellant=s intent

In his second issue, appellant contends that the district court erred by allowing Dr. Peacock to testify as to her opinion regarding appellant=s intent. During Dr. Peacock=s testimony, the State asked a three-part hypothetical question based on the facts of the case. Before the State finished presenting the hypothetical, appellant objected that Dr. Peacock=s opinion about intent based on the hypothetical would invade the province of the jury. The judge allowed the State to finish the hypothetical and ask the ultimate question. Appellant did not object when the State asked the ultimate question based on the facts, that is, whether the impact causing the injury was so strong that any actor would have been reasonably certain that it would cause death or at least bodily injury; the judge then overruled appellant=s previous objection. Dr.

10

Peacock answered that anyone causing the injury would have been immediately aware that the child was likely to be severely injured. The State asked a follow-up question without objection, to which Dr. Peacock answered that it would be instinctive to see this kind of injury occur and understand that there was a great possibility of death.

Despite appellant=s objection to Dr. Peacock=s testimony, similar evidence had already been admitted through the testimony of Dr. Kellogg, Dr. Jankowski and Dr. Aronin. Because other evidence of the same type was already before the jury without objection, appellant has failed to preserve error regarding this issue. *See Leday v. State*, 983 S.W.2d 713, 715-20 (Tex. Crim. App. 1998); *McFarland v. State*, 845 S.W.2d 824, 840 (Tex. Crim. App. 1992). We overrule appellant=s second issue.

*Officer=s testimony about appellant=s angry reaction during interrogation*

Finally, in his third issue, appellant contends that the district court erred by allowing Lieutenant Roescher to testify about appellant=s demeanor and reaction during a police interrogation. Lieutenant Roescher testified that police officers interrogated appellant on three occasions. During the first interrogation, appellant showed no remorse or emotion regarding the baby=s death. At the other two interrogations, appellant at times feigned grief, and on one occasion, became very angry when accused as a suspect. The State attempted to ask Lieutenant Roescher a question about appellant=s angry outburst during interrogation.

| [State=s attorney]: | Was there a period of time during that June 15 of the year 2000 interview [appellant] got mad? |
|---|---|
| [Roescher]: | Yes. |

11

[State=s attorney]:     In what way?

[Roescher]:             After he had given the statement and I asked him if everything was true on it and correct, and if it was the truth, I needed him to sign the statement. And that made him mad. He didn=t want to sign it.

[State=s attorney]:     Did he think you were accusing him, in some way, of harming [the baby]?

[Roescher]:             Yes.

[State=s attorney]:     How angry did he get?

[Roescher]:             He got angry enough that heChe finally left the building, got up and left.

[State=s attorney]:     Did he sign the paper?

[Roescher]:             Yes.

[State=s attorney]:     What was his state of mind or emotional state when he left the building?

[Roescher]:             He was mad.

[State=s attorney]:     Now, if he had been covering for somebody, if he had been covering for somebody, would that day, based upon his anger, have beenC

[Appellant=s attorney]: Objection, Your Honor. The very nature of the question calls for speculation on this witness as to the mental state of the person he=s being asked a question about.

[The Court]:            With the understanding, members of the jury, that this is a hypothetical question, then I=ll permit it.

12

[State=s attorney]:    Hypothetically, if he had been covering for somebody, would his anger that you saw and heard as to being a suspect been inconsistent with covering for somebody?

[Roescher]:    No.

[State=s attorney]:    What do you mean by that?

[Roescher]:    I mean, I wouldn=t have expected him to be angry like that, if he was trying to cover for somebody else.

[State=s attorney]:    At that point, would you have expected the cover to stop, when he felt the focus begin to come in on him, for a capital crime involving potentially the death penalty?

[Roescher]:    Yes.

The trial court has broad discretion in determining whether to admit or exclude evidence. *Allridge v. State*, 850 S.W.2d 471, 492 (Tex. Crim. App. 1991). The trial court=s ruling will not be disturbed on appeal absent an abuse of discretion. *Id.* A trial court does not abuse its discretion so long as its ruling is within the zone of reasonable disagreement. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990).

The intent of appellant=s was an ultimate issue in this case. Any post-incident statements by appellant indicating a consciousness of guilt were relevant upon the issue of intent. *See Torres*, 794 S.W.2d at 598-99. Alternatively, Lieutenant Roescher=s testimony was admissible as a relevant opinion of a lay witness. *See* Tex. R. Evid. 701. Lieutenant Roescher personally observed appellant=s angry reaction during interrogation as well as appellant=s demeanor on other occasions after the incident. Lieutenant Roescher rationally based his opinion on facts actually perceived by him. As such, his opinion regarding appellant=s

13

demeanor was admissible.  *See Fairow v. State*, 943 S.W.2d 895, 897-900 (Tex. Crim. App. 1997).

Appellant has not shown that the district court abused its discretion when admitting this evidence.  We

overrule appellant=s third issue.

## Conclusion

We affirm appellant=s conviction.

_____

Marilyn Aboussie, Chief Justice

Before Chief Justice Aboussie, Justices B. A. Smith and Yeakel

Affirmed

Filed:   August 30, 2002

Do Not Publish