# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-03-00508-CR

### Charlene M. Hopper aka Charlene M. Planelles, Appellant

### v.

### The State of Texas, Appellee

### FROM THE DISTRICT COURT OF BELL COUNTY, 27TH JUDICIAL DISTRICT
### NO. 53,527, HONORABLE JOE CARROLL, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury found Charlene M. Hopper guilty of felony murder and sentenced her to fifty-five years' imprisonment. *See* Tex. Pen. Code Ann. § 19.02(b)(3) (West 2003). Hopper challenges her conviction contending that (1) the evidence was factually insufficient to support a conviction, (2) the trial court erred by refusing to instruct the jury on the lesser included offense of criminally negligent homicide, and (3) her conviction under the "felony murder rule" could not be premised on the underlying offense of injury to a child. We affirm the judgment of conviction.

## FACTUAL BACKGROUND

Hopper was convicted of the murder of K.T., an eleven-month-old child that she was babysitting. The child died as a result of a head injury sustained at Hopper's home. Hopper

contended that K.T. fell from a crib and hit his head. She was the only adult present. The evidence presented at trial focused on the nature of K.T.'s injuries and Hopper's account of the events surrounding the child's death.

A series of expert witnesses testified about the cause of K.T.'s fatal head injury. The State's expert witnesses generally discounted the possibility that K.T. had been injured in a fall from a crib; rather, they all concluded that K.T.'s injuries were the result of abuse. The defense called two expert witnesses who testified that children can sustain fatal head injuries from short falls and that K.T.'s injuries were consistent with a fall from a crib.

During its case in chief, the State called pediatric neurologist Darrell Crisp to testify about his prior treatment of K.T., as well as the injury that resulted in K.T.'s death. K.T.'s father brought K.T. for a check up with Dr. Crisp on the day K.T. died before leaving the child with Hopper. Dr. Crisp had been treating K.T. because he suffered a stroke at birth and had seizures soon after delivery. K.T. was given anti-seizure medication until he reached seven months of age when test results showed no abnormalities and his seizure activity had not recurred. Dr. Crisp testified that he examined K.T. in the morning on the day he died and found nothing unusual. Dr. Crisp confirmed that he reviewed K.T.'s autopsy report and that K.T. had not sustained these injuries at the time of the check up.

The State also called pediatric surgeon Monford Daniel Custer, who treated K.T. when he was brought to the hospital with the fatal head injury. When Dr. Custer arrived in the emergency room, CPR was being performed on K.T. Dr. Custer explained that he examined K.T. and concluded that the child was dead. Dr. Custer testified that there was little visible trauma to K.T., but there was retinal hemorrhage in one of K.T.'s eyes. He testified that the reported history

2

of K.T.'s falling out of a crib was inconsistent with the retinal hemorrhage injury.[1] K.T. also had dependent rubor, which is a settling of the blood within the body that generally occurs thirty minutes to an hour after death. Dr. Custer testified that the administration of CPR prevents the onset of dependent rubor and that its presence raised suspicion that K.T. had died before CPR was administered.

Pathologist Joni McClain supervised the autopsy of K.T.'s body. Dr. McClain testified that she found bruises on the right side and back of K.T.'s head. When she looked under K.T.'s scalp, she found two separate areas of bruising on the right side of the head. She also found injury to the brain in the form of subdural hemorrhage.[2] Dr. McClain stated that she also found evidence of injury to the brain itself. She concluded that K.T.'s death was the result of his head hitting another object or an object hitting his head, that the force necessary to sustain such an injury was similar to that seen in automobile accidents, and that the injury would not have been caused by a fall of three to four feet from a crib.

The defense called pathologist John Plunkett to discuss his review of the evidence and his opinion that K.T.'s injuries were consistent with a fall from a crib. Dr. Plunkett explained that the force of a child falling from the height of a crib was sufficient to cause the fatal subdural hemorrhage. He explained that the absence of external injuries such as a skull fracture, bleeding

---

[1] On cross examination, Dr. Custer stated that he had seen retinal hemorrhage caused by the administration of CPR in other cases.

[2] Dr. McClain explained that a subdural hemorrhage is the result of the tearing of veins which connect the brain to its fibrous covering called the dura.

from the scalp, or other marks on the body led him to believe that K.T.'s injuries were not the result of abuse. He stated that K.T.'s retinal hemorrhage was not significant and discounted the other bruises on K.T.'s head as minor. Dr. Plunkett based his opinion, in part, on an article he published examining cases where children had died from head injuries sustained in relatively short falls.

In rebuttal, the State called pediatric critical care physician David Hardy. Dr. Hardy reviewed the autopsy information and observed Dr. Plunkett's testimony. Dr. Hardy disagreed with Dr. Plunkett that a short fall could have produced K.T.'s injury. He explained that, in his experience, it would take more force than that involved in a short fall to cause the injuries K.T. sustained. He also disputed Dr. Plunkett's research showing that some children died from short falls. Dr. Hardy noted that the majority of the falls documented in the research were not witnessed, and therefore, it could not be proven that they were, in fact, short falls. He further testified that the results of Dr. Plunkett's research were not applicable to a child as young as K.T.

The State also called Saami Shaibani, a clinical professor specializing in injury mechanisms. Professor Shaibani discussed the physics of how a human body reacts to trauma. He first explained that he did not believe that a child K.T.'s size could physically have fallen out of the crib on his own. He then discussed the behavior of a child's body as it falls and concluded that the injuries K.T. sustained could not have been caused by a fall from a crib.

In response, the defense presented the testimony of neuropathologist Jan Leestma. Dr. Leestma stated that he believed that a child K.T.'s size could have fallen out of a crib. He also discussed the impact a fall from a crib would have on a child's head and brain and concluded that K.T.'s injuries were consistent with such a fall.

4

Forensic pathologist Linda Norton then testified as an additional rebuttal witness about the relevance of slides taken of a portion of K.T.'s dura. Dr. Norton concluded that a child K.T.'s age and size would have difficulty getting out of a crib, would not have sustained serious injury from the fall, and would not have received three separate bruises on the head from such a fall. The defense briefly re-called Dr. Leestma to clarify some issues raised by Dr. Norton's testimony.

In addition to the eight expert witnesses who testified regarding the possible causes and extent of K.T.'s injuries, the trial focused on inconsistencies in Hopper's account of the events surrounding K.T.'s death. Hopper testified that K.T.'s father, Aaron Thompson, dropped him off at 11:15 or 11:30 a.m. on the day K.T. died. Hopper was also watching her own son and another child. She testified that K.T. was crying and that was unusual behavior for the child. She asked his father why K.T. was crying and was informed that he was hungry. Hopper testified that she put K.T. down for a nap soon after he arrived and that he woke up about an hour later. She noted that this was unusual for K.T. whom she described as "a sleeper." Hopper testified that K.T. was unusually fussy when he awoke. She called Aaron Thompson and asked for the cell phone number of K.T.'s mother Monica Thompson. Aaron Thompson said that he would have Monica Thompson call her. Hopper testified that she called Aaron Thompson two or three times before Monica Thompson contacted her. Hopper asked Monica Thompson what was wrong with K.T. and if something had happened that morning. Hopper testified that Monica Thompson told her that K.T. had fallen off the couch and hit his head on the coffee table that morning. Hopper stated that she noticed the right side of K.T.'s face was red.

Hopper testified that she played with K.T. and her own son until about 3:30 p.m. She then placed K.T. in a crib in a bedroom in the back of her home for another nap. K.T. was alone in the room, and Hopper went to another part of the house with her son. She explained that she was not out of the room for more than a minute or so when she heard a noise from the back of the house. She stated that she returned as fast as she could and thought that the noise could have been caused by one of her cats. When she entered the room, she saw K.T. lying on the floor having a seizure. Hopper testified that she picked him up and called 911 for help. K.T. lost consciousness, and Hopper began administering CPR. Hopper called 911 again ten minutes later because an ambulance had not arrived. Eventually, a first responder arrived and took over the CPR.

Hopper stated that she then called Amy Millikin, the mother of the other child under Hopper's care and a relative of Monica Thompson. She told Millikin that K.T. had fallen and asked that Millikin come over. Hopper stated that she also called and asked her sister to come over. Hopper then turned to taking care of the remaining children and answering the questions of investigators. Hopper stated that she spoke with Monica Thompson that evening, apologized, and told her that she did not know that K.T. could climb out of the crib. Hopper specifically denied harming K.T. in any way.

On cross examination Hopper admitted that she had asked Millikin if K.T.'s parents planned to press charges. The State questioned Hopper about a number of inconsistencies between what Hopper told various people at the time of the incident and her trial testimony. These included whether K.T. was having a seizure, her description of the noise she heard, and whether K.T. hit his head on a changing table.

6

Both Aaron and Monica Thompson testified that Hopper did not call them to inquire if anything was wrong with K.T. but rather to check on the status of a cell phone she ordered from Monica Thompson's employer.

At the conclusion of the five-day presentation of evidence and argument, the jury acquitted Hopper of capital murder but found her guilty of the lesser offense of felony murder. After a brief sentencing hearing in which the State presented no evidence, the jury sentenced Hopper to fifty-five years' imprisonment.

## DISCUSSION

### Factual Sufficiency

In Hopper's first issue, she challenges the factual sufficiency of the evidence supporting the jury's verdict. When conducting a factual sufficiency review, we consider all the evidence including the testimony of defense witnesses and the existence of alternative hypotheses. *See Orona v. State*, 836 S.W.2d 319, 321 (Tex. App.—Austin 1992, no pet.). A factual sufficiency review asks whether a neutral review of all the evidence, both for and against the finding of guilt, demonstrates that the proof of guilt is so obviously weak or the contrary proof is so strong as to undermine confidence in the jury's determination of guilt beyond a reasonable doubt. *Zuniga v. State*, No. 539-02, 2004 Tex. Crim. App. LEXIS 668, at *20 (Tex. Crim. App. Apr. 21, 2004); *see Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000). As in a legal sufficiency review, we must defer to the jury's determination of what weight to give contradictory testimonial evidence because resolution often turns on an evaluation of credibility and demeanor, an evaluation better suited for jurors who were in attendance when the testimony was delivered. *Johnson*, 23 S.W.3d at 8. It is the

7

jury's prerogative to reject all or part of the evidence and draw reasonable inferences from the evidence presented. *Clewis v. State*, 922 S.W.2d 126, 135 (Tex. Crim. App. 1996).

Hopper contends that the evidence as a whole does not rationally justify the jury's finding of guilt beyond a reasonable doubt. *See Zuniga*, No. 539-02, 2004 Tex. Crim. App. LEXIS 668, at *20. She argues that the experts disagreed as to whether K.T.'s injuries could have been caused by an accidental fall, and that there was no evidence whatsoever of any act by Hopper that caused the injury.

When an adult defendant has had sole access to a child at the time his injuries are sustained, Texas courts have repeatedly found the evidence sufficient to support a conviction for injury to a child or murder if the child dies. *Garcia v. State*, 16 S.W.3d 401, 405 (Tex. App.—El Paso 2000, pet. ref'd); *see Flores v. State*, 102 S.W.3d 328, 335-36 (Tex. App.—Eastland 2003, pet. ref'd); *Robbins v. State*, 27 S.W.3d 245, 248-49 (Tex. App.—Beaumont 2000), *aff'd*, 88 S.W.3d 256 (Tex. Crim. App. 2002); *Bryant v. State*, 909 S.W.2d 579, 583 (Tex. App.—Tyler 1995, no pet.); *see also Elledge v. State*, 890 S.W.2d 843, 846-47 (Tex. App.—Austin 1994, pet. ref'd) (when appellant was alone with baby when fatal injury was inflicted, new evidence would probably not bring about different result in new trial). Here, there was ample expert testimony that (1) it was unlikely that K.T. could have fallen out of the crib on his own, (2) the force needed to sustain K.T.'s head injury was greater than that caused by a fall from a crib, and (3) K.T. suffered three separate impacts to the head. The State's expert witnesses consistently concluded that K.T.'s injuries could not have resulted from a fall from a crib. Additionally, there was medical testimony that Dr. Crisp examined K.T. just before he was taken to Hopper's home and that he had no head injuries at the

8

time. Furthermore, Hopper's account of her actions at the time of K.T.'s death was contradicted by the testimony of others. We must defer to the jury's assessment of credibility and demeanor in making its determination of what weight to give to the evidence. Having neutrally reviewed all of the evidence we conclude that the evidence presented by the State was factually sufficient to prove the elements of the offense. *See Zuniga*, No. 539-02, 2004 Tex. Crim. App. LEXIS 668, at *20. We overrule Hopper's first issue.

**Lesser Included Offense**

In her second issue, Hopper contends that the trial court erred by rejecting her requested jury charge on criminally negligent homicide as a lesser included offense. The determination of whether a defendant is entitled to a lesser included offense instruction is a two pronged test: (1) the lesser included offense must be included within the proof necessary to establish the offense charged, and (2) some evidence must exist in the record that would permit a jury rationally to find that, if the defendant is guilty, he is guilty only of the lesser included offense. *Wesbrook v. State*, 29 S.W.3d 103, 113 (Tex. Crim. App. 2000); *Rousseau v. State*, 855 S.W.2d 666, 672-73 (Tex. Crim. App. 1993). The evidence must establish the lesser included offense as a valid, rational alternative to the charged offense. *Arevalo v. State*, 943 S.W.2d 887, 889 (Tex. Crim. App. 1997). "This evidence can come from any source, however weak or controverted." *Barcenes v. State*, 940 S.W.2d 739, 745 (Tex. App.—San Antonio 1997, pet. ref'd); *see Thomas v. State*, 699 S.W.3d 845, 849 (Tex. Crim. App. 1985). A lesser included offense instruction is not justified by isolated facts taken from the record out of context. *Id.*; *see Ramos v. State*, 965 S.W.2d 463, 465 (Tex. Crim. App. 1993).

A person commits the offense of criminally negligent homicide if she causes the death of an individual by criminal negligence. Tex. Pen. Code Ann. § 19.05 (West 2003). Criminal negligence is defined by the penal code:

> A person acts with criminal negligence, or is criminally negligent, with respect to circumstances surrounding his conduct or the result of his conduct when he ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. This risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

*Id*. § 6.03(d); *Thomas*, 699 S.W.2d at 849.

Hopper points to evidence in the record that K.T. was placed in a crib that was improperly adjusted so that the mattress was in the highest position, and to her testimony that she did not know that K.T. could fall out of the crib. Her contention is that she was entitled to an instruction on the lesser included offense of criminally negligent homicide because she was not aware, but should have been, that the improperly adjusted crib created a substantial and unjustifiable risk that K.T. would fall.

There is indeed some evidence in the record to show that Hopper was not aware that K.T. could fall from the crib and that the crib was improperly adjusted. No evidence was elicited, however, suggesting that the placement of an eleven-month-old child in an improperly adjusted crib was a gross deviation from the standard of care, or that a fall from a crib created a substantial and unjustifiable risk of serious injury. In fact, the only experts to testify that K.T.'s injuries could have been sustained in a fall both conceded that death from such a fall would be unusual. *See Barcenes*,

10

940 S.W.2d at 746 (criminally negligent homicide instruction unsupported when evidence would not have placed reasonable person on notice that child would die as result of fall). If the jury believed Hopper's testimony and concluded that K.T. died from a fall, she would not have been guilty of any offense. Absent evidence that Hopper's placement of K.T. in an improperly adjusted crib was negligent and that it created a substantial and unjustifiable risk of a serious head injury, a jury could not rationally find Hopper guilty only of criminally negligent homicide, and she was therefore not entitled to an instruction on that offense. *See Thomas*, 699 S.W.2d at 849; *Barcenes*, 940 S.W.2d at 746. We overrule Hopper's second issue.

**Felony Murder Based on Injury to a Child**

In her final issue, Hopper contends that she may not be convicted of felony murder based on the underlying felony of injury to a child because injury to a child is a lesser included offense of manslaughter. A conviction for felony murder may not be based on a lesser included offense of manslaughter. *Lawson v. State*, 64 S.W.3d 396, 397 (Tex. Crim. App. 2001); *Johnson v. State*, 4 S.W.3d 254, 258 (Tex. Crim. App. 1999).

Hopper cites *Lawson v. State* that involved a felony murder conviction where the underlying felony was aggravated assault. *See* 64 S.W.3d at 396. Generally, aggravated assault is a lesser included offense of manslaughter and therefore may not be used to establish a felony murder conviction. *See Johnson*, 4 S.W.3d at 258. The court of criminal appeals permitted the use of the aggravated assault to support a felony murder conviction in *Lawson*, however, because the indictment alleged that Lawson committed the assault "intentionally and knowingly." *Id*. Manslaughter entails only reckless conduct. *See* Tex. Pen. Code Ann. § 19.04 (West 2003). The

11

court reasoned that, because *Lawson* could not be convicted for reckless conduct, the indicted offense was not a lesser included offense of manslaughter. *Lawson*, 64 S.W.3d at 397.

Hopper contends that the offense of injury to a child allows for a conviction based upon the *mens rea* of recklessness and it is therefore a lesser included offense of manslaughter. To the contrary, the court of criminal appeals clearly stated in *Johnson* that the offense of injury to a child is not a lesser included offense of manslaughter. *See* 4 S.W.3d at 258. This is because the statute requires the State to prove the additional fact that the victim of the offense of injury to a child was under the age of fourteen. *See* Tex. Pen. Code Ann. § 22.04(c)(1). Because the offense of injury to a child is not a lesser included offense of manslaughter, it was a proper basis for Hopper's felony murder conviction. We therefore overrule Hopper's third issue.

### CONCLUSION

Having overruled all of Hopper's issues, we affirm the judgment of conviction.

_____

Bea Ann Smith, Justice

Before Justices Kidd, B. A. Smith and Pemberton

Affirmed

Filed:   September 23, 2004

Do Not Publish

12