COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-06-239-CR

DENISE ELVERIOUS MILLER APPELLANT

 V.

THE STATE OF TEXAS STATE

------------

FROM THE 16TH DISTRICT COURT OF DENTON COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------ 

I.  Introduction

Denise Elverious Miller appeals a jury verdict finding her guilty of murder.  The trial court sentenced her to sixty-two years’ confinement.  In three points, Miller contends that the trial court erred by denying her motion to suppress, by admitting testimony of four witnesses, and by failing to include certain definitions and instructions on lesser included offenses in the jury charge.  We will affirm.

II.  Factual Background

In December 2004, Miller lived at 2604 Elk Horn in Little Elm, Texas (the “Elk Horn home”).  Miller shared the Elk Horn home with her two high-school -aged children and Little Elm police officer Jonathan Wayne Irby.  When Officer Irby failed to report for his 6:00 a.m. shift and failed to call in on December 10, his fellow officers became worried because it was unusual for Officer Irby to miss work and unusual for him to not call in.  Little Elm police officers James Wynn and Jerry Walker attempted to contact Officer Irby on his cell phone on numerous occasions that morning but to no avail.  After failing to reach Officer Irby on his cell phone, Officer Walker—who worked for the Little Elm Police Department as a school resource officer at the Little Elm High School—spoke with Miller’s daughter, W.M., and son, W.M., Jr. at the high school.  W.M. and W.M., Jr. gave Officer Walker a pass code to the Elk Horn home garage, and Officer Walker relayed that pass code to Officer Wynn and Officer Cruljack.  

Officer Wynn arrived at the Elk Horn home around 9:30 a.m.  He saw Officer Irby’s squad car across the street from the house, but he could not see or hear anything inside the house.  Officer Wynn used the pass code that Officer Walker had received from W.M. and W.M., Jr. to enter the Elk Horn home garage.  Once inside the Elk Horn home, Officer Wynn did not find anyone but did discover Officer Irby’s prescription sunglasses, which Officer Irby customarily had with him.  After completing the welfare check at the Elk Horn home, Officer Wynn continued answering calls and doing routine patrol work. 

But later that day, Officer Wynn traveled to 432 Willow Lake in Little Elm, Texas (the “Willow Lake home”), to see if Officer Irby was there.  Officer Irby had leased the Willow Lake home in October after experiencing problems in his relationship with Miller, and he had reportedly moved in, out, and back into the Willow Lake home in November and December 2004.  At the request of Officer Wynn, Francis Gabriel—the part owner and property manager of the Willow Lake home—brought the keys and gave officers permission to enter the Willow Lake home.  Officers Wynn and Walker entered the home and saw Officer Irby’s cell phone, fanny pack, and a piece of paper that had something written on it lying on the kitchen counter top.  Seeing Officer Irby’s cell phone and fanny pack led them to believe that Officer Irby was in the house because he kept those items with him at all times.  Officer Wynn continued through the Willow Lake home and soon observed Officer Irby’s lifeless body lying face down between a bedroom and the hallway.  Officer Wynn was unable to detect Officer Irby’s pulse and saw a gunshot wound to the back of Officer Irby’s head. 

After investigating the crime scene and determining that Miller was a suspect, Texas Ranger Tracy Murphree prepared an affidavit for a search warrant of the Elk Horn home.  After securing and executing the search warrant, Texas Ranger Murphree did not find Miller at the Elk Horn home, but he did seize a journal, handgun ammunition, a handwritten note from Miller to her children, a credit card statement, and some bank and credit card receipts.   On the very next day, Vicki Sandberg—the general manager of Ramada Limited in Gainesville, Texas—received a phone call from the front desk informing her that someone had fallen in one of the rooms and had called the front desk seeking help in getting up.  After arriving at the room, Sandberg discovered that the door was locked and called the maintenance man to let her in.  When she opened the door, Sandberg saw Miller lying on the floor, noticed bloody linens on the floor, noticed a piece of paper with a gun on top of it on the desk, and heard Miller say that she had fallen and hit her head on something.  

When Gainesville police officers arrived with an ambulance shortly thereafter, Gainesville Police Department Officer Tom Reynolds noticed blood around Miller’s lips, saw that her eye was swollen shut and appeared to be bulging out, and noticed a small wound by Miller’s right temple.  Medical personnel later diagnosed the small wound by her right temple as a self-inflicted gunshot wound.  Officer Reynolds and Officer Mike Morris, a criminal investigator with the Gainesville Police Department, found a handwritten note in which Miller confessed to killing Officer Irby, two handguns, empty liquor bottles, and sleeping pills in Miller’s Ramada room.  

The State charged, and the grand jury indicted, Miller for intentionally or knowingly causing the death of Officer Irby by shooting him with a firearm.  Miller filed a motion to suppress the fruits of the initial search of the Elk Horn home, claiming that police did not have probable cause or other justification for searching the Elk Horn home.  The trial court denied Miller’s motion, a jury subsequently found Miller guilty of murder, and the jury assessed her punishment at sixty-two years’ confinement.  Miller timely filed her notice of appeal, and this appeal ensued.

III.  Motion to Suppress 

In her first point, Miller contends that the trial court erred by denying her motion to suppress written statements discovered by police officers after entering her home without a warrant.  Assuming without deciding that the trial court did err by denying Miller’s motion, however, we conclude that Miller was not harmed.  
See, e.g., Ibarra v. State
, 11 S.W.3d 189, 194 (Tex. Crim. App. 1999) (assuming error in denial of motion to suppress but nevertheless finding admission of evidence harmless), 
cert. denied
, 531 U.S. 828 (2000). 

Having assumed error, 
we must conduct a harm analysis to determine whether the error calls for reversal of the judgment.  
Tex. R. App. P.
 44.2.  If the error is constitutional, we apply rule 44.2(a) and reverse unless we determine beyond a reasonable doubt that the error did not contribute to Miller’s conviction or punishment.  
Tex. R. App. P.
 44.2(a).  Otherwise, we apply rule 44.2(b) and disregard the error if it did not affect Miller’s substantial rights.  
Tex. R. App. P.
 44.2(b); 
see Mosley v. State,
 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh’g), 
cert. denied
, 526 U.S. 1070 (1999); 
Coggeshall v. State
, 961 S.W.2d 639, 642-43 (Tex. App.—Fort Worth 1998, pet. ref’d).
 

The harm analysis for a trial court’s erroneous denial of a motion to suppress and subsequent admission of evidence obtained in violation of the Fourth Amendment is rule 44.2(a)’s constitutional standard.  
See Hernandez v. State
, 60 S.W.3d 106, 108 (Tex. Crim. App. 2001); 
McQuarters v. State
, 58 S.W.3d 250, 258 (Tex. App.—Fort Worth 2001, pet. ref’d).  
The question under that standard is whether the trial court’s denial of a motion to suppress and subsequent admission of evidence was harmless beyond a reasonable doubt.  
See Williams v. State
, 958 S.W.2d 186, 194 (Tex. Crim. App. 1997).  In applying the “harmless error” test, our primary question is whether there is a “reasonable possibility” that the error might have contributed to the conviction.  
Mosley
, 983 S.W.2d at 259.

Our harmless error analysis should not focus on the propriety of the outcome of the trial; instead, we should calculate as much as possible the probable impact on the jury in light of the existence of other evidence.  
Wesbrook v. State
, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000), 
cert. denied
, 532 U.S. 944 (2001).  We consider the source and nature of the error, the extent that it was emphasized by the State, its probable collateral implications, the weight a juror would probably place on the error, and whether declaring it harmless would be likely to encourage the State to repeat it with impunity.  
Harris v. State
, 790 S.W.2d 568, 587 (Tex. Crim. App. 1989).  This requires us to evaluate the entire record in a neutral, impartial, and even-handed manner, not “in the light most favorable to the prosecution.”  
Id.
 at 586. 

At trial, Miller sought exclusion of the handwritten note that Little Elm police officers discovered during their initial search of the Elk Horn home.  In that note, Miller wrote,

I apologize for everything, every decision that I made, whether good or bad.  I thought that my decisions were good for all, but they weren’t.  I got tired of hurting and allowing others to hurt me.  Please forgive me and continue to pray for my soul.

Nothing in that note definitively implicates Miller in Officer Irby’s murder.  If anything, this note demonstrates that Miller was remorseful for past decisions.  The State did not emphasize this note, and the probable collateral implications of admitting this note were minimal, at best, considering that the jury also heard the contents of two other handwritten notes, neither of which Miller objected to at trial or contests the admissibility of in this appeal.

One of those other notes was discovered at the Willow Lake home at the same time that Officers Wynn and Walker discovered Officer Irby’s dead body.  In that note, Miller wrote, “I did it.  I took our lives.  Call our moms. [Phone number], Denise.  Wayne, [phone number].”  The other note was discovered at the Gainesville Ramada Limited where police found Miller alive with a self-inflicted gunshot wound to the head.  That note was the longest and most detailed of the three.  A portion of that note read,

I’m here because I killed my boyfriend this afternoon.  His name is J. Wayne Irby.  He is a Little Elm police officer . . . . You can find his body at 432 Willow Lake Drive in Little Elm, Texas.  He is scheduled to be at work at six a.m. on Friday morning.

. . . . 

I’m sorry about everything that I have done and lives that I have affected.  I accidentally shot him and then freaked out and ran.  The only solution that I knew what to do was to kill myself also . . . .

He’s in the hallway and partially in the second bedroom.  I know I’m going to hell and I can’t fix anything now.  I’m so sorry.  I apologize to my family and more so to his.  I did a horrible thing.

The jury had the opportunity to examine all three notes and to hear the notes read to them out loud.  While the note obtained from the initial search of the Elk Horn home may have, arguably, given the jury an example of Miller’s remorse for some unspecified past decision, it did not expressly implicate Miller in Officer Irby’s murder like the other two notes did, and the jury nevertheless had the opportunity to see and hear any remorse exhibited by Miller in both of the other two notes.  When considering the probable impact of this first disputed note in light of the other evidence, we cannot say that there is a reasonable probability that this first note would have contributed to Miller’s conviction. 

After carefully reviewing the record and performing the required harm analysis under rule 44.2(a), we hold beyond a reasonable doubt that the trial court’s error did not contribute to Miller’s conviction or punishment.  
See
  
Tex. R. App. P.
 44.2(a).
  We overrule Miller’s first point.

IV.  Testimony of Four Witnesses

In her second point, Miller contends that the trial court reversibly erred by admitting into evidence the testimony of four witnesses who each referenced hearsay statements made by the deceased victim, thereby depriving her of her rights of confrontation and cross-examination. 

A.  Nontestimonial Statements

We will uphold a trial court’s evidentiary ruling if it is reasonably supported by the record and is correct under any theory of applicable law.  
Martin v. State
, 173 S.W.3d 463, 467 (Tex. Crim. App. 2005); 
see Cantu v.

State
, 842 S.W.2d 667, 682 (Tex. Crim. App. 1992), 
cert. denied
, 509 U.S. 926 (1993).  In deciding whether the admission of these statements violated appellant’s right to confrontation, we review the trial court’s ruling de novo. 
Wall v. State
, 184 S.W.3d 730, 742-43 (Tex. Crim. App. 2006).

The accused in a criminal prosecution has the right to be confronted with the witnesses against her.  
See 
U.S. Const.
 amend. VI.  A trial court violates an accused’s Sixth Amendment rights by admitting a hearsay statement made by a nontestifying declarant if the statement was testimonial and the accused lacked a prior opportunity for cross-examination.  
See Crawford v. Washington
, 541 U.S. 36, 68, 124 S. Ct. 1354, 1374 (2004); 
Wall
, 184 S.W.3d at 734.  A testimonial statement is therefore inadmissible unless it is shown that the declarant is presently unavailable and the accused had a prior opportunity for cross-examination.  
See Wall
, 184 S.W.3d at 734-35.  A testimonial statement is inadmissible even though it may fall within a “firmly rooted hearsay exception or bears particularized guarantees of trustworthiness.”  
Id
.  While courts across the state and nation continue to struggle with determining what a “testimonial” statement is, the statements that Miller complains of in the instant case do not fall within any court’s definition of “testimonial.”

The Supreme Court is clear that the term “testimonial” covers (1) ex parte in-court testimony or its functional equivalent, (2) extrajudicial statements contained in formalized testimonial materials such as prior testimony at a preliminary hearing, before a grand jury, or at a former trial, and (3) police interrogations.  
See Crawford
, 541 U.S. at 52, 124 S. Ct. at 1364;
 Martinez v. State
, No. 02-06-00088-CR, 2007 WL 2067852, at *7 (Tex. App.—Fort Worth July 19, 2007, no pet. h.).  In determining the testimonial character of a statement, we contemplate the declarant’s ability to appreciate the legal ramifications of his statement.  
Wall
, 184 S.W.3d at 742. 

Miller contends that testimony of Officer Wynn; Officer Walker; Officer Irby’s landlord, Francis Gabriel; and Cynthia Medrano regarding Miller and Officer Irby’s relationship all violated Miller’s Sixth Amendment rights because they were based on statements that Officer Irby previously had made to them.  Officer Wynn testified that Officer Irby had told him that his and Miller’s relationship “wasn’t going too good and that he was - - he was thinking about moving back out.”  Officer Walker testified that Officer Irby had previously told him that the relationship with Miller “was not working.”  Gabriel testified that Officer Irby had told him that he was leasing the Willow Lake home because “he was separating” from his “partner.”  Medrano testified that Officer Irby had told her that his relationship with Miller “was not working” and that he was “planning on moving.”  

The record does not reflect that these statements were the functional equivalents of ex parte in-court testimony, were extrajudicial statements contained in formalized testimonial material, or were made in response to police interrogation.  Nor does the record reflect that Officer Irby—the declarant—had the ability to contemplate the legal ramifications of his statements.  Some of the statements were made at least a month before the shooting, and all of the statements were made to Officer Irby’s friends at a time when no reasonable person in Officer Irby’s position would have contemplated that the statements would be used in later legal proceedings.  We therefore hold that Miller’s Sixth Amendment rights were not violated because Officer Irby’s statements to the four witnesses were nontestimonial statements.  
See, e.g., King v. State
, 189 S.W.3d 347, 359 (Tex. App.—Fort Worth 2006, no pet.) (holding that statements made to friends in course of conversations about how murder victim died and about disposing of murder victim’s body were nontestimonial).  

B.  Harmless Error in Admitting Hearsay Statements

Although we hold that the statements were nontestimonial and that the admission of the four witnesses’ testimonies did not therefore violate Miller’s Sixth Amendment rights, we must nevertheless address whether the hearsay statements were otherwise inadmissible within the rules of evidence.  
See id.
 at 359-60.  Assuming without deciding that the four witnesses’ statements regarding the relationship between Miller and Officer Irby were inadmissible hearsay statements and that the trial court erred by admitting them, we must conduct a harm analysis to determine whether the error calls for reversal of the judgment.  
Tex. R. App. P.
 44.2.

If the error is constitutional, we apply rule 44.2(a) and reverse unless we determine beyond a reasonable doubt that the error did not contribute to Miller’s conviction or punishment.  
Tex. R. App. P.
 44.2(a).  Otherwise, we apply rule 44.2(b) and disregard the error if it did not affect Miller’s substantial rights.  
Tex. R. App. P.
 44.2(b); 
see Mosley, 983
 S.W.2d at 259; 
Coggeshall v. 
 961 S.W.2d at 642-43.
 
 The admission of inadmissible hearsay is not constitutional error.
(footnote: 2)  
See Lopez v. State
, 200 S.W.3d 246, 255 (Tex. App.—Houston [14th Dist.] 2006, pet. ref’d).

Because we determine that the assumed error is not constitutional, rule 44.2(b) is applicable.  
Tex. R. App. P.
 44.2(b).  A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury’s verdict.  
King v. State
, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing 
Kotteakos v. United States
, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)); 
Coggeshall,
 961 S.W.2d at 643.  In making this determination, we review the record as a whole. 
 See Johnson v. State
, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). 

As we previously indicated, the four witnesses’ statements at issue here all related to the relationship between Miller and Officer Irby.  Miller does not indicate how the admission of these statements affected her substantial rights.  At trial, the jury heard evidence that Officer Irby died from a gunshot wound to the back of the head, that no one had heard from Officer Irby or Miller since the night before Officer Irby’s death, that police found two handguns in the hotel room where Miller was found with a gunshot wound to her head, and that Miller confessed to shooting Officer Irby in multiple handwritten notes and claimed it was an accident.
(footnote: 3)  

We conclude that, in the context of the entire case against Miller, any error committed by the trial court in admitting the testimony in question did not have a substantial or injurious effect on the jury’s verdict and did not affect Miller’s substantial rights.  
See King
, 953 S.W.2d at 271.  Thus, we disregard the error and overrule Miller’s second point.  
See
 
Tex. R. App. P.
 44.2(b).

V.  Jury Charge

In her third point, Miller contends that the trial court erred by failing to include in the jury charge (1) the lesser included offenses of criminally negligent homicide and manslaughter and (2) legal definitions of “voluntary conduct” and “intentional, knowing [,] and reckless.”  

A. Proper Jury Charge

Miller contends that the trial court erred by failing to include the lesser included offenses of criminally negligent homicide and manslaughter in the jury charge.  Miller specifically argues that because one of her notes indicated that the shooting was “accidental,” and because the medical examiner testified that he could not rule out the possibility that negligence caused Officer Irby’s death, she was entitled to a jury charge including the lesser included offenses of manslaughter and criminally negligent homicide. 

We use a two-step analysis to determine whether an appellant was entitled to a lesser included offense instruction.  
Hall v. State
, 225 S.W.3d 524, 528 (Tex. Crim. App. 2007); 
Rousseau v. State
, 855 S.W.2d 666, 672-73 (Tex. Crim. App.), 
cert. denied
, 510 U.S. 919 (1993).  First, the lesser offense must come within article 37.09 of the code of criminal procedure.  
Tex. Code Crim. Proc. Ann.
 art. 37.09 (Vernon 1981); 
Moore v. State,
 969 S.W.2d 4, 8 (Tex. Crim. App. 1998).
  
“An offense is a lesser included offense if . . . it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission.”  
Tex. Code Crim. Proc. Ann
. art. 37.09(3).

Second, some evidence must exist in the record that would permit a jury to rationally find that if the appellant is guilty, she is guilty only of the lesser offense.  
Hall,
 225 S.W.3d at 536; 
Salinas v. State
, 163 S.W.3d 734, 741 (Tex. Crim. App. 2005); 
Rousseau
, 855 S.W.2d at 672-73.  The evidence must be evaluated in the context of the entire record.  
Moore
, 969 S.W.2d at 8.  
Isolated facts taken out of context from the record will not justify a lesser included offense instruction. 
Barcenas v. State
, 940 S.W.2d 739, 745 (Tex. App.—San Antonio 1997, pet. ref’d).
  There must be some evidence from which a rational jury could acquit the appellant of the greater offense while convicting her of the lesser included offense.  
Moore
, 969 S.W.2d at 8.  The court may not consider whether the evidence is credible, controverted, or in conflict with other evidence.  
Id.
  Anything more than a scintilla of evidence may be sufficient to entitle a defendant to a lesser charge.  
Hall
, 225 S.W.3d at 536.
 

The State concedes that Appellant satisfied the first step with respect to both manslaughter and criminally negligent homicide because both of those offenses simply require a less culpable mental state than that required for murder.  Under the second step, we must determine whether 
there is some evidence in the record that would permit a jury to rationally find that if Miller is guilty, she is guilty only of the lesser offense.  
See id.

The offenses of manslaughter and criminally negligent homicide require evidence of a substantial and unjustifiable risk that the result will occur, and that the accused’s failure to perceive or conscious disregard of that risk is a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.  
Barcenas
, 940 S.W.2d at 746.  

To support her claim that the jury should have been charged on these lesser included offenses, Miller relies on two points.  First, Miller points to evidence in the record that her handwritten note found at the Ramada—the longest and most detailed of the three notes—stated, “I accidentally shot him.”  Second, Miller points to the medical examiner’s testimony that he could not rule out negligence as a cause of death.  

This evidence is not proof that Miller was aware of, but ignored, a substantial and unjustifiable risk that death would result from her actions.  
See id.
  Neither is it proof that Miller failed to perceive or consciously disregarded a substantial and unjustifiable risk that death would result from her actions.  
See id.
  The record does not provide evidence from which a rational jury could acquit Miller of murder while convicting her of manslaughter or criminally negligent homicide.  
See Moore
, 969 S.W.2d at 8.
  
We therefore hold that the record does not contain evidence that would permit a jury rationally to find that if Miller was guilty, she was guilty only of manslaughter or criminally negligent homicide.
(footnote: 4)  
See Barcenas
, 940 S.W.2d at 746.  We overrule Miller’s third point.

VI.  Conclusion

Having overruled Miller’s three points, we affirm the trial court’s judgment. 

 SUE WALKER

 JUSTICE

PANEL F: LIVINGSTON, DAUPHINOT, and WALKER, JJ.

DO NOT PUBLISH

Tex. R. App. P.
 47.2(b)

DELIVERED: September 13, 2007

FOOTNOTES
1:
See
 
Tex. R. App. P.
 47.4.

2:
Because we previously held that the admission of these statements did not violate Miller’s Sixth Amendment rights, we likewise hold that any error in admitting the statements is nonconstitutional.

3:
We note that the statements that Miller complains about—statements indicating that Miller and Officer Irby had been experiencing problems in their relationship—dovetail with her theory that the shooting was accidental.

4:
Although Miller also contends that the trial court erred by not including definitions of “voluntary conduct” and “recklessness,” the terms “voluntary conduct” and “recklessness,” or any forms thereof, do not appear in the trial court’s charge to the jury.  Because the charge did not include those terms, the trial court did not err by not including definitions of those terms in the charge.  
See, e.g., Lapp v. State
, 519 S.W.2d 443, 446 (Tex. Crim. App. 1975) (holding that definition of terms was not necessary where jury charge did not mention terms).